(No. 67710.—

VAN'S MATERIAL COMPANY, INC., Appellee, v. THE
DEPARTMENT OF REVENUE *et al.*, Appellants.

*Opinion filed September 27, 1989.*

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of Chicago, of counsel), for appellants.

Louis R. Hegeman and Jay D. Stein, of Gould & Ratner, of Chicago, for appellee.

JUSTICE CLARK delivered the opinion of the court:

At issue in this case is whether the purchase of ready-mix concrete trucks is subject to either the Use Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 439.1 *et seq.*) or the Retailers' Occupation Tax Act (ROTA) (Ill. Rev. Stat. 1985, ch. 120, par. 440 *et seq.*) or whether those statutes' exemptions for machinery used primarily for manufacturing tangible personal property (Ill. Rev. Stat. 1985, ch. 120, pars. 439.3, 441) are applicable to such a purchase. In June 1985, Van's Material Company (Van's), an Illinois corporation operating its business in Midlothian, Illinois, purchased two ready-mix concrete trucks from Oshkosh Truck Corporation in Oshkosh, Wisconsin. Van's paid the use tax on the purchase price of both trucks to the Department of Revenue (the Department) under protest. In August 1985, Van's filed a complaint, in the circuit court of Cook County, for declaratory judgment against the Department, seeking to establish that ready-mix concrete trucks are not subject to the Use Tax

Act or ROTA pursuant to the respective statutory exemptions. Van's also sought a refund of taxes paid under protest on the trucks. The trial court granted summary judgment in favor of the Department and its officers, relying extensively on the Department's regulations, and denied Van's motion for summary judgment. The appellate court reversed and remanded with instructions to enter summary judgment in favor of Van's. (173 Ill. App. 3d 284, 291.) For the reasons stated below, we affirm.

Van's is engaged in the business of manufacturing, selling and delivering ready-mix concrete. To carry out its business, Van's owns 15 ready-mix concrete trucks, the newest two being the focus of this case. The manufacturing process for ready-mix concrete begins when the four component parts, sand, limestone, water and cement, in specific proportions, are loaded into the turning hollow drum mixer on the ready-mix concrete truck. This initial phase is referred to as the charging process. Once the charging process is completed, the second phase, referred to as the mixing process, begins. When the mixer is rotating at its highest speed, the mixing process can be completed in about 8 to 10 minutes. The mixer must continue to rotate, however, until delivery of the ready-mix cement is completed. During this process, the truck's engine must be kept running at all times, as it is the source of power which keeps the mixer rotating.

Once the ready-mix concrete truck reaches the delivery site, tests are performed on the product to ascertain the quality of the ready-mix concrete. Adjustments are made to the contents, as necessary, by adding water. When the product is the desired consistency and the purchaser of the product is prepared to receive the product, the ready-mix concrete is discharged from the truck into a chute which is directed to the specific location determined by the purchaser. At this point, the consistency of ready-mix cement is described as "mushy." After dis-

charging its load of ready-mix cement, the truck returns to Van's to begin the manufacturing process again.

The ready-mix concrete is formed into the desired shape by the purchaser after delivery. The product, which began in a "mushy" state at delivery, reaches a solid state within 24 hours; the full curing process, however, can take up to 28 days or longer.

The specific Use Tax Act provisions being construed in this case exempt taxation of certain purchases of machinery and equipment:

"A tax is imposed upon the privilege of using in this State tangible personal property ***. ***

\* \* \*

The tax imposed by this Act does not apply to the use of machinery and equipment primarily in the process of the manufacturing or assembling of tangible personal property for wholesale or retail sale ***. This exemption includes machinery and equipment which replaces machinery and equipment in an existing manufacturing facility as well as machinery and equipment which is for use in an expanded or new manufacturing facility." (Ill. Rev. Stat. 1985, ch. 120, par. 439.3.)

The Act also defines "manufacturing process" in the same section:

" '[M]anufacturing process' shall mean the production of any article of tangible personal property, whether such article is a finished product or an article for use in the process of manufacturing or assembling a different article of tangible personal property, by procedures commonly regarded as manufacturing, processing, fabricating, or refining which changes some existing material or materials into a material with a different form, use or name." Ill. Rev. Stat. 1985, ch. 120, par. 439.3.

The provisions of the Retailers' Occupation Tax Act which address the manufacturing exemption are substantially identical. (See Ill. Rev. Stat. 1985, ch. 120, par. 441.) This court has noted the similarity between the

two acts in the past: "Functionally, the Use Tax Act serves to tax property purchased out of State by Illinois residents that is not taxable under the Retailers' Occupation Tax Act or the tax act of another State. The Use Tax Act thus prevents the avoidance of the Retailers' Occupation Tax Act ***." (*Chicago Tribune Co. v. Johnson* (1985), 106 Ill. 2d 63, 68.) Although the initial action of Van's sought a declaratory judgment as to both the use tax and the tax under the ROTA, the purchase here under consideration was specifically subject to the provisions of the Use Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 439.1 *et seq.*). While we address the question before us in terms of the use tax, our decision is applicable to both acts.

The Department contends that the appellate court misstated the standard of construction for tax exemption provisions; that a ready-mix concrete truck is not machinery used primarily in the manufacturing process; that the exemption is limited to machinery used in a manufacturing facility with a fixed location; that granting the exemption to ready-mix concrete trucks does not serve the legislative purpose; and that even if the mixer is tax-exempt, the truck chassis is subject to the use tax. Van's argues that the language of the statute and the legislative history of the exemption support its contention that the ready-mix concrete truck in its entirety is machinery used in the manufacturing process and that the Department's regulation requiring that the manufacturing process take place in a fixed location is unduly restrictive. In essence, we are being asked to determine whether or not the purchase of a ready-mix concrete truck is exempt from the use tax.

To answer the question we must engage in a two-tier analysis. The first tier requires construction of the statute; the second tier requires that we determine whether the statutory exemption applies. The mere fact that an

exemption is involved in the statute does not negate the necessity to first strictly construe the statute prior to determining the boundaries of the exemption. Only after the statute has itself been analyzed can we determine if the exemption fits the particular case. (See *Canteen Corp. v. Department of Revenue* (1988), 123 Ill. 2d 95, 105-07.) The State's attempt to jump to the second tier without having crossed the first misapplies the law.

In construing a taxing statute, as correctly noted by the appellate court, this court has long held that "[t]axing statutes are to be strictly construed. Their language is not to be extended or enlarged by implication, beyond its clear import. In cases of doubt they are construed most strongly against the government and in favor of the taxpayer." *Mahon v. Nudelman* (1941), 377 Ill. 331, 335; see also *Canteen Corp. v. Department of Revenue* (1988), 123 Ill. 2d 95, 105; *Chet's Vending Service, Inc. v. Department of Revenue* (1978), 71 Ill. 2d 38, 42.

In strictly construing the similar provisions of the Use Tax Act and the ROTA, the primary rule is to ascertain and give effect to the intention of the legislature, and that inquiry must begin with the language of the statute. (*Canteen Corp. v. Department of Revenue* (1988), 123 Ill. 2d 95, 104; *Metropolitan Life Insurance Co. v. Washburn* (1986), 112 Ill. 2d 486, 492.) In addition to considering the language of the statute, a court may properly consider the purposes to be attained by the law, the necessity for the law and the evils sought to be remedied. (*Canteen Corp.*, 123 Ill. 2d at 104; *Stewart v. Industrial Comm'n* (1987), 115 Ill. 2d 337, 341.) The legislative history or background of a statute (*e.g.*, legislative committee reports as well as House and Senate floor debates) may be an instructive resource in ascertaining the legislative intent. (*Chicago Tribune Co. v. Johnson* (1985), 106 Ill. 2d 63, 69.) We also note that, generally, administrative interpretations of a statute promulgated

by the agency charged with the administration and enforcement of the statute receive some respect and deference from the courts, but they are clearly not binding on the courts. (*Canteen Corp.*, 123 Ill. 2d at 104-05; *Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243, 247.) In addition, this court has noted that "[a]dministrative rules can neither limit nor extend the scope of a statute." *Du-Mont Ventilating*, 73 Ill. 2d at 247-48.

In accordance with precedent for review of a statute, we first look to the specific language of the Use Tax Act. We note here that the same analysis is applicable to the comparable provisions of the ROTA; however, for purposes of this review we limit our discussion to the provisions of the Use Tax Act.

The provisions of the Act apply to "machinery and equipment primarily in the process of the manufacturing or assembling of tangible personal property." (Ill. Rev. Stat. 1985, ch. 120, par. 439.3.) In reviewing the terms of this provision, we will examine three distinct words or phrases which form the gist of the statute: (1) "tangible personal property"; (2) "process of the manufacturing or assembling"; and (3) "primarily." Thus, an essential component in a determination of applicability of the provisions of this act involves resolution of the question, Is the specific product being produced "tangible personal property"? In the case before us, we answer that question in the affirmative.

Without defining "tangible personal property," we note that ready-mix concrete, the product delivered and discharged from the ready-mix concrete trucks, has long been subject to the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 440 *et seq.*). The record indicates that on every sale of the product ready-mix concrete, Van's has paid and continues to pay to the Department the 5% tax imposed by the Act on the sale of

tangible personal property. The 5% tax is imposed not only on the product itself but also on minimum-load charges not separately contracted for. (See *Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382 (wherein this court held that the minimum-load charge under review was includable in the gross receipts on the sale and subject to the retailers' occupation tax; this decision was based on the undisputed implicit presumption that the ready-mix concrete product was tangible personal property subject to the tax).) Although the Department attempts to argue in its brief that ready-mix concrete becomes real property rather than personal property, in its reply brief the Department acknowledged that "ready-mix concrete is tangible personal property— a fact which the Department does not contest." We conclude that ready-mix concrete is tangible personal property within the terms of the Act. We need not address the Department's novel and anomalous "real property" argument, as we note that this court has already upheld a Department position recognizing ready-mix concrete as tangible personal property. (See generally *Material Service Corp.*, 98 Ill. 2d 382.) The Department has not offered any reason or rationale which persuades our court to change that position. That, following the full 28-day curing process, ready-mix concrete may sometimes become so affixed to the ground as to be considered real property is too far removed from the time of transfer of ownership of the product to be a matter of significance for our review.

We next turn our attention to the second of our three phrases for review, the phrase "process of the manufacturing or assembling" in the statutory provisions. "Manufacturing" is a term which has been defined within the Act:

" '[M]anufacturing process' shall mean the production of any article of tangible personal property, whether such

article is a finished product or an article for use in the process of manufacturing or assembling a different article of tangible personal property, by procedures commonly regarded as manufacturing, processing, fabricating, or refining which changes some existing material or materials into a material with a different form, use or name." Ill. Rev. Stat. 1985, ch. 120, par. 439.3.

We noted earlier in this opinion, and it is not disputed, that ready-mix concrete is composed of sand, limestone, water and cement. These four separate materials, when combined in specific proportions, form a mushy substance with a new and distinct name: ready-mix concrete. The product created may be used in ways that each of the components, used separately, could not be used. Ready-mix concrete thus meets the standard set in the last portion of the manufacturing definition: "procedures *** which change[ ] some existing material or materials into a material with a different form, use or name." Ill. Rev. Stat. 1985, ch. 120, par. 439.3.

The procedures used in manufacturing not only must change existing materials into a new material but must also utilize "procedures commonly regarded as manufacturing, processing, fabricating, or refining." (Ill. Rev. Stat. 1985, ch. 120, par. 439.3.) The Department argues that the production of ready-mix concrete is not "commonly regarded" as manufacturing. In support, the Department looks to its own regulations which limit a finding that a process is commonly regarded as manufacturing to one where that process is so regarded by the general public and is limited to a fixed location. (86 Ill. Adm. Code §130.330(b)(3) (1985).) We will examine the phrases "fixed location" and "general public" in turn.

The Department contends that the following language in the statute supports its limitation of manufacturing to processes that occur in a fixed location: "This exemption

includes machinery and equipment which replaces machinery and equipment in an existing manufacturing facility as well as machinery and equipment which is for use in an expanded or new manufacturing facility." (Ill. Rev. Stat. 1985, ch. 120, par. 439.3.) The use of the phrase "manufacturing facility," the Department argues, limits the exemption to activities which occur only in a fixed location since a facility can only be found in a fixed place. We do not agree that such a limitation is inherently clear from the language used in the statute.

While it may be true that one of the definitions of the word "facility" alludes to its being a place, we also note the following definitions: (1) "something that promotes the ease of any action, operation, transaction, or course of conduct"; (2) "something *** that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." (Webster's Third New International Dictionary 812-13 (1986).) A ready-mix concrete truck fits neatly within the above definitions as both something which promotes the ease of an action or operation (mixing the four component parts to create a different and new product) and something which is built to perform a particular function (mix the ready-mix concrete and prevent the product from hardening prematurely). It is certainly not unreasonable that these definitions, noted by a well-recognized resource, were also among those that the legislature intended in its use of the word "facility."

We turn now to the second component of the Department's definition of "commonly regarded," that the process must be so regarded as manufacturing by the general public. We note first that the language of the statute does not indicate by whom the procedure must be "commonly regarded" as manufacturing. Even accepting the Department's designation of the "general public" as the determining body, we note that the De-

partment has offered no evidence to support a contention that the general public does or does not consider a ready-mix concrete truck to be manufacturing equipment. Rather, it concludes that if the truck were commonly regarded by the general public as manufacturing equipment, the present litigation would not be occurring and that, therefore, the statutory definition of manufacturing does not allow for the ready-mix concrete trucks to be so classified. The Department appears to have equated its own current determination of what may be considered manufacturing to be the same as that held by the general public. While Van's did not offer any evidence or surveys which indicated how the general public views ready-mix concrete trucks, it did cite both prior Department rulings and past court opinions which indicated that the work undertaken by the trucks was generally considered to be a manufacturing process.

In interpreting the term "commonly regarded" it seems evident that application of the terms of the statute is not to be guided by some hyperbolical definition of manufacture but rather is subject to commonsense interpretations based on past and current understanding. (See *Canteen Corp. v. Department of Revenue* (1988), 123 Ill. 2d 95, 105; *Kozak v. Retirement Board* (1983), 95 Ill. 2d 211, 216.) At the inauguration of this statute in 1979, what was the understanding of the word "manufacture"?

This court reviewed the definition of manufacturing in a 1912 case in order to determine whether or not the making of bakers' goods and restaurant supplies fits within the definition. In *H.H. Kohlsaat & Co. v. O'Connell* (1912), 255 Ill. 271, this court relied on a United States Supreme Court analysis:

" 'The primary meaning of the word "manufacture" is something made by hand as distinguished from a natural growth, but as machinery has largely supplanted this

primitive method the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily, the article so manufactured takes a different form or at least subserves a different purpose from the original materials and usually it is given a different name. Raw materials may be, and often are, subjected to successive processes of manufacture, each one of which is complete in itself but several of which may be required to make the final product.' " (*Kohlsaat & Co.*, 255 Ill. at 272, quoting *Tide-Water Oil Co. v. United States* (1898), 171 U.S. 210, 216, 43 L. Ed. 139, 141, 18 S. Ct. 837, 839.)

The issue of defining the word and process of manufacturing was addressed a second time in 1912; this court determined that "[w]henever labor is bestowed upon an article which results in its assuming a new form, possessing new qualities or new combinations, the process of manufacturing has taken place." *Dolese & Shepard Co. v. O'Connell* (1912), 257 Ill. 43, 45.

While neither of these decisions dealt with a ready-mix concrete truck, the definitions are still of assistance in determining what has been commonly regarded as manufacturing. Indeed, it was against just such a legal background and understanding of the term that the Department itself promulgated regulations and issued advisory opinions over the years. In one such opinion issued in April 1962, the Department, confronted with a question about separating the transportation and delivery charges from the cost of ready-mix concrete, concluded:

"A study of the physical characteristics of the ready-mix concrete leads us to the conclusion that transportation or delivery charges cannot be separately stated in arriving at the base for which to apply the retailers' occupation tax or the use tax.

Paragraph 4a of Article 3 applies to a separate charge for delivery when dealing with a completed article which is ready for use. This does not apply to the sale of ready-mixed concrete because the agitation that takes

place on the truck while it is being delivered from the seller to the job site is actually part of the manufacturing process and is therefore a part of the entire selling price and not a charge that can be separately contracted for and separately stated." Department of Revenue Bulletin, April 1, 1962.

While the Department would have this court ignore the letter ruling from 1962 based on its contention that the legislature has defined manufacturing differently since issuance of the letter, we find the argument unpersuasive. Indeed, the statutory definition itself instructs that what has been *commonly regarded* as manufacturing is indeed manufacturing for purposes of the statute's exemption. That the Department itself has in the past considered what occurs on a ready-mix concrete truck as manufacturing is further support for the argument of Van's. The process of making ready-mix concrete fits neatly within the accepted definitions of manufacturing and has been so considered in the past by the Department. The subsequent passage of the statute which defines manufacturing as what has been commonly regarded as manufacturing does not provide the Department an opportunity to alter past perception for its own benefit.

Earlier in this opinion we addressed the Department's contention that the statutory provisions limit manufacturing to a situation in which the process only takes place in a fixed location and found that argument lacking in merit. The Department's rules and regulations limiting manufacturing to a fixed location and attempting to define "commonly regarded" by its own limited definition are unduly restrictive in the light of the statutory language. This court has long held that administrative rules may not limit the scope of a statute. (*Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243, 247-48.) Even if the regulations were not deter-

mined to be unduly restrictive, we are not bound by the Department's interpretations of the statute. (*Canteen Corp. v. Department of Revenue* (1988), 123 Ill. 2d 95, 104-05; *Du-Mont Ventilating*, 73 Ill. 2d at 247.) We therefore decline to limit manufacturing to fixed locations or to apply the Department's limited definition of the term "commonly regarded."

We turn now to the last phrase of the statutory definition of manufacturing process, which limits the application of the statute to the production of tangible personal property. We have already discussed this issue above and determined that ready-mix concrete is tangible personal property. Thus, we conclude that tangible personal property (ready-mix concrete) is produced by procedures commonly regarded as manufacturing (on a ready-mix concrete truck) which changes certain materials (sand, limestone, water and cement) into a material with a different form (mushy as opposed to grainy or liquid), use and name (ready-mix concrete). The second phrase of the statutory provisions, which limit application to processes of manufacturing, could indeed be met by ready-mix concrete trucks.

The third and last phrase or word of the statute which we review stipulates that the provisions are applicable to machinery and equipment "primarily" used in the process of manufacturing. The Department argues before this court that a ready-mix concrete truck is not used primarily in the manufacture of ready-mix concrete but rather is merely an instrument of transportation for the product. We note, however, that the issue of primary use was not properly before the trial court, as the appellate court properly noted. 173 Ill. App. 3d at 290.

During the discovery process, the Department was served with a set of interrogatories. In its first response, the Department objected to virtually every question presented by Van's. Following various efforts on the part of

the attorneys for Van's to secure adequate information, Van's filed a motion before the trial court on June 17, 1986, for sanctions against the Department for failure to answer discovery. Although it is not clear from the record what the trial court's ruling on the motion was, on August 13, 1986, the Department's answer to the interrogatories was filed. Interrogatory 8a posed the question "Do the Defendants contend that a redi-mix truck is used in the process of manufacturing but that it is not *primarily* used in the process of manufacturing?" (Emphasis in original.) The Department's answer was "No!" (Punctuation in the original.) Under our rules, an interrogatory may be used in evidence to the same extent as a deposition. (107 Ill. 2d R. 213(f).) Our rules provide that a discovery deposition may be used as an admission made by a party. (107 Ill. 2d R. 212(a)(2).) While the Department apprehends these rules, it contends that its answer was merely an evidentiary admission which may be controverted rather than a judicial admission which must be accepted when it is a statement of fact which is clear and unequivocal. The Department cites *Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, as support for its argument that the answer was not a judicial admission.

*Hansen* involved answers given in a plaintiff's deposition in which he indicated that a certain object was the source of his injury. The plaintiff later revisited the site of the accident and discovered that his answers had been wrong; his attorney attempted to have the answers to the deposition changed. (*Hansen*, 155 Ill. App. 3d at 478.) The appellate court found, however, that the plaintiff's answers to the questions posed were unequivocal and that he was therefore bound by the answers given. (155 Ill. App. 3d at 481.) The court reasoned that a plaintiff cannot later change the facts to support a possible ruling in his favor. 155 Ill. App. 3d at 480.

The court in *Hansen* indicated that a judicial admission is a "deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge." (155 Ill. App. 3d at 480.) It was also noted that " '[a] party may not create a genuine issue of material fact by taking contradictory positions, nor may he remove a factual question from consideration just to raise it anew when convenient.' " (*Hansen*, 155 Ill. App. 3d at 480, quoting *Schmahl v. A.V.C. Enterprises, Inc.* (1986), 148 Ill. App. 3d 324, 331.) The court additionally noted that answers proffered "constitute binding judicial admissions only if they are unequivocal." *Hansen*, 155 Ill. App. 3d at 480.

The Department attempts to distinguish *Hansen* by asserting that its answer did not involve a fact and was additionally not unequivocal. While it may be more than a matter of semantics as to what constitutes a fact, we are not persuaded by the Department's arguments. The question posed to the Department did not ask for a conclusion; rather, it asked the Department to identify its "contentions." The Department would be the only body able to answer that question; its beliefs or contentions are peculiarly and completely within its own determinations. (See *Hansen*, 155 Ill. App. 3d at 482.) Additionally, we note that while the Department persisted in objecting to other questions, it did not do so with question 8a.

Additionally, current arguments that the answer was not unequivocal are without merit. While the court in *Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76, as the Department correctly notes, did recognize that deposition testimony is ordinarily an evidentiary admission that may be controverted, the court also went on to acknowledge and apply the reasoning expressed by the court in *Young v. Pease* (1983), 114 Ill. App. 3d 120, wherein the court noted that " '[t]here may be cases in which admissions at pre-trial depositions are so deliber-

ate, detailed, and unequivocal, as to matters within the party's personal knowledge, that they will conclusively bind the party-deponent, and he will not be heard to contradict the admissions at the trial' " (*Young*, 114 Ill. App. 3d at 122-23).

As the court did in *Lindenmier*, we similarly find in the case now before us that it is clear from the answer to the interrogatory that the Department did not view the tax issue as one of primary use. To allow the Department to later alter its contention would have severe ramifications on the ability of Van's to properly defend its position. We also note that, although it may seem that a growing number of people pay little to no attention to grammatical rules and conventions, we cannot say that one who answers a written question with a single word punctuated with an exclamation point is not giving an emphatic and unequivocal answer.

Moreover, even were we to assume that the Department could assert the primary-use argument, that would not alter our ultimate conclusion; the argument is without merit. We note that the record clearly indicates that the vehicle engine operates the rotating drum and that the vehicle must be kept running at all times when the ready-mix cement is in the mixer drum. In addition, the president of Van's indicated that the chassis is useless to him without the mixer drum. Not only is the vehicle engine and supporting chassis a "machine[ ] contributing to a manufacturing *** process" (Ill. Rev. Stat. 1985, ch. 120, par. 439.3), but we determine that it can be treated no differently than other machinery "essential to an integrated manufacturing *** process." Ill. Rev. Stat. 1985, ch. 120, par. 439.3.

The Department's contention that the legislative intent as evidenced by the debates on the House and Senate floors supports its position is also without merit. Indeed, we find that the Department patently misstates

and misconstrues the legislative history of this statute before our court. The original statute, effective January 1, 1979, ultimately resulted from two similar bills sent to the Conference Committee: Senate Bill 736 and House Bill 3168. The bills had similar provisions for providing "sales tax relief for manufacturing equipment, for new and used machinery, for new industry and for old industry here in the State of Illinois." (80th Ill. Gen. Assem., House Proceedings, June 27, 1978, at 80-81 (statements of Representative Ewing).) The statute that came out of the Conference Committee and was voted on by both the Senate and the House on June 30, 1978, applied to "machinery and equipment *directly and exclusively* in the manufacturing or assembling of tangible personal property." (Emphasis added.) Pub. Act 80—1292, eff. Jan. 1, 1979.

Less than six months after the provisions which became section 3 of the Use Tax Act became effective, amendatory provisions were being proposed in the legislature through House Bill 1596. This bill was the result of a hearing of the Joint Committee on Administrative Rules based on the fact that members of the legislature felt that the Department had promulgated rules and regulations for implementation of the statute which "circumvented the intent of the Legislature." (81st Ill. Gen. Assem., House Proceedings, May 24, 1979, at 83 (statements of Representative Flinn).) Representative Flinn also noted:

> "The Bill changes the definition of manufacturing and adds a definition of assembling process machinery and equipment to better describe what we're talking about. One of the key changes is changing the requirement for the exemption from direct and exclusive use of the machinery in manufacturing to primarily using the work [*sic*] primarily, is used in the manufacturing process."

(81st Ill. Gen. Assem., House Proceedings, May 24, 1979, at 84.)

It was again reiterated that the purpose of the original statute was to "give business a tax exemption on capital investment." 81st Ill. Gen. Assem., House Proceedings, June 29, 1979, at 239 (statements of Representative Ewing).

Similar concerns were raised during proceedings on the Senate floor where it was stated that the statute was being amended because "the Department of Revenue has had very strict interpretations of what the legislative intent was, and it's made it extremely difficult in many cases for the manufacturers to comply with their rules and regulations, and still get the exemption that we intended them to have." (81st Ill. Gen. Assem., Senate Proceedings, June 27, 1979, at 376-77 (statements of Senator Regner).) Senator Moore also commented:

"We enacted this bill [Public Act 80—1292] a year or two ago, and maybe not in our wisdom we allowed the Department of Revenue to promulgate rules and regulations. Now, they went off in direct derogation of what this legislative Body intended, when we enacted this exemption bill. The Commission for Economic Development went over and sat down and talked to the Department of Revenue. The Department of Business and Economic went over ... the department went over and talked to the Department of Revenue, and tried to get them to conform with our wishes as we enacted them. In effect they told us to go to hell. *** I think this is an excellent bill *** to fulfill the original legislative intent of this bill, when it was originally enacted." 81st Ill. Gen. Assem., Senate Proceedings, June 27, 1979, at 378-79.

In distinguishing sister State case law interpreting statutes which apply to machinery directly used in manufacturing, the Department contends that "Illinois *** *additionally* requires that the machinery be primarily used in the manufacturing process." (Emphasis added.)

This is clearly not the case. The history of this legislative enactment indicates that the language changed from *directly and exclusively* to *primarily* in an effort to make clear to the Department the intent of the legislature. This is not an additional requirement which implies a higher standard; it is a word replacement which was clearly used to indicate the wide applicability that the legislature intended that the statute have. It is a lessening of the required standard. The legislature was intent on providing certain benefits to businesses involved in manufacturing tangible personal property.

The first part of our analysis is complete; we have strictly construed the statutory provisions by looking at the language and the legislative intent. We now turn to the second part of our analysis, which requires a determination of whether Van's has met its burden of proving that ready-mix concrete trucks come within the provisions of the exemption. As this court has previously stated, "[a] person claiming an exemption from taxation has the burden of proving clearly that he comes within the statutory exemption. Such exemptions are to be strictly construed, and doubts concerning the applicability of the exemptions will be resolved in favor of taxation." (*United Air Lines, Inc. v. Johnson* (1981), 84 Ill. 2d 446, 455.) Indeed, the presumption is against the intent to exempt the property from taxation. *United Air Lines*, 84 Ill. 2d at 456.

Even starting with the presumption that the ready-mix concrete truck is not included in the statutory exemption, once we examine the record for testimony about the equipment it is evident that Van's has met its burden of proving that a ready-mix concrete truck is entitled to benefit from the exemption provisions. Exhibits submitted by Van's support the fact, and it is not contested, that four different components are put into a mixer drum to create a new and finished product, ready-

mix concrete. The entire vehicle is essential to the process, as Van's indicated in uncontroverted testimony: the engine of the truck powers the mixer drum, requiring that the truck remain running from the time the four component parts are placed into the mixer drum until the new product, ready-mix concrete, is discharged from the mixer and delivered to the purchaser. That ready-mix concrete may take a different shape when formed by the purchaser and that it has a different texture 24 hours after delivery does not alter our analysis. The ready-mix concrete truck is an inseparable and single piece of equipment because it is fit for only one purpose. Van's has met its burden of proof, as demonstrated throughout our discussion.

Accordingly, for the reasons given, we affirm the judgment of the appellate court.

*Judgment affirmed.*