NBZ ENTERPRISES, INC., the successor in interest of Scott County Lumber Company, et al., Appellants,

v.

CITY OF SHAKOPEE, Respondent.

No. C0-91-2455.

Court of Appeals of Minnesota.

Aug. 11, 1992.

Review Denied Sept. 30, 1992.

Timothy R. Thornton, Jack Y. Perry, Briggs & Morgan, P.A., Minneapolis, for appellants.

George C. Hoff, Patricia E. Kuderer, Hoff & Allen, P.A., Eden Prairie, for respondent.

Considered and decided by NORTON, P.J., and LANSING and DAVIES, JJ.

## OPINION

NORTON, Judge.

NBZ Enterprises, Inc., et al., challenge the trial court judgment that a ready-mix concrete operation is not permitted under the Conditional Use Permit and Mineral

Extraction and Land Rehabilitation Permit issued by respondent, City of Shakopee. The City of Shakopee filed a notice of review challenging the trial court's reinstatement of appellant's Conditional Use Permit.

## FACTS

Appellants, NBZ Enterprises, Inc., et al. (hereafter NBZ), own and operate a sand and gravel mining business in the City of Shakopee, respondent. The sand and gravel pit is located in an area zoned as an Agricultural Preservation District pursuant to City of Shakopee Zoning Ordinance section 11.24. Section 11.24, subd. 3 requires a Conditional Use Permit (CUP) to mine the sand and gravel. A Mineral Extraction and Land Rehabilitation Permit (MELRP) is required for all commercial mining operations under City of Shakopee Zoning Ordinance section 11.07, subd. 7.

On September 21, 1984, NBZ applied for a CUP to extract gravel from its land. Merila & Associates, the engineers who prepared NBZ's application for the CUP, submitted a plan to the Shakopee City Council on April 30, 1985. This plan specifically stated that NBZ had no intention to mix asphalt or cement on the property. Shakopee issued a CUP and MELRP to NBZ on April 5, 1988 pursuant to this court's order. *Scott County Lumber Co., Inc. v. City of Shakopee,* 417 N.W.2d 721, 728 (Minn.App.1988), *pet. for rev. denied* (Minn. Mar. 23, 1988). Since that date, NBZ has mined, crushed and washed gravel on the property.

The CUP and MELRP are subject to renewal every three years. On May 9, 1991, Shakopee renewed the permits subject to NBZ's 1991 application for renewal describing the mining operation as "mining, crushing, washing and processing of aggregate."

In June 1991, NBZ erected on the property a ready-mix concrete plant estimated at taller than 35 feet. Shakopee subsequently received complaints that a ready-mix plant was being operated on NBZ's property. In a June 13, 1991 letter, Shakopee informed NBZ that the ready-mix plant was considered a nonpermitted use on the property

which must be removed by June 24, 1991. NBZ ceased operation of the ready-mix plant. But, due to the significant financial investment, NBZ refused to disassemble the plant until a neutral third party decided the dispute as to whether the ready-mix plant violated the CUP and MELRP.

On August 20, 1991, Shakopee revoked the CUP. After a hearing on August 21, 1991, the trial court granted a temporary restraining order enjoining NBZ from operating the ready-mix plant, and Shakopee from revoking NBZ's CUP.

In its October 16, 1991 judgment, the trial court ordered Shakopee to reinstate NBZ's CUP because there was no repeated or substantial violation giving Shakopee the authority to revoke the CUP. The trial court also ordered NBZ to dismantle its ready-mix concrete plant and remove it from the property by December 15, 1991 because neither the MELRP nor CUP authorized a ready-mix concrete plant on the property.

## ISSUES

I. Does the term "processing" in NBZ's renewal application for the MELRP show NBZ's intent to operate a ready-mix concrete plant at the site of its gravel mine and bind Shakopee?

II. Does the term "processing" in Shakopee's zoning ordinance section 11.05, subd. 7 C 6 include the mixing of sand, gravel and cement into concrete?

III. Is the ready-mix concrete plant a permitted accessory use to NBZ's sand and gravel operation?

IV. Did Shakopee have a sufficient basis to revoke NBZ's CUP?

## ANALYSIS

### I.

NBZ argues that the trial court erred in finding that it had no intent to operate a ready-mix concrete plant at the time the MELRP was originally issued and its renewal was intended to be a major amendment to allow a ready-mix plant at its gravel mine site. The trial court found NBZ to

not be in compliance with the MELRP issued and renewed by Shakopee, thereby requiring the dismantling and removal of the ready-mix concrete plant from the gravel mine site.

■ The trial court's finding that there was no intent to operate a ready-mix concrete plant on NBZ's property is a finding of fact. Findings of fact will not be set aside unless clearly erroneous with due regard given to the opportunity of the trial court to judge the credibility of the witnesses. Minn.R.Civ.P. 52.01. On appeal, this court will reverse only, if upon reviewing the evidence, it is left with the firm conviction that a mistake has been made. *City of Minnetonka v. Carlson*, 298 N.W.2d 763, 766 (Minn.1980).

■ NBZ argues that the Merila report stating NBZ's intention not to mix concrete on its property is not part of the original or renewal application for the MELRP.

The record shows that when application was made for the CUP and the MELRP in 1985, NBZ submitted a report prepared by Merila & Associates describing NBZ's plans for its sand and gravel business located in an area zoned agricultural preservation district (AG). This report specifically states "[t]here is no intent to mix asphalt or concrete at this site."

The Merila report stating that NBZ had no intent to mix concrete at the site was a part of the original 1985 application to mine gravel at this site and the original application is referred to in the 1991 renewal application. The description of the operation on the 1985 application for the MELRP states "extraction of gravel from the site (See report)." NBZ was referring Shakopee to its Merila report. In its 1991 application for the renewal of the MELRP, NBZ refers Shakopee to its 1985 application.

NBZ also did not request the addition of a ready-mix concrete plant at the time of the renewal of its application. At the May 9, 1991 planning commission meeting which reviewed and approved the renewal of the CUP and MELRP, NBZ only requested amendments to the CUP. These amendments included the addition of two security lights on the property and extended operating hours.

Additionally, any structure in excess of 35 feet in height in an AG zone requires a CUP. Shakopee, Minn., Zoning Ordinance § 11.24, subd. 3 M (1989). There was testimony at trial that NBZ's ready-mix concrete plant exceeds 35 feet in height. Since NBZ did not request a CUP for a structure in excess of 35 feet in height, Shakopee could reasonably conclude that the term "processing" as used in the MELRP renewal application did not include the ready-mix plant. Also, the MELRP application requires maps of the entire site which are to include any structures to be erected. The maps submitted by NBZ did not include ready-mix cement plant.

When NBZ included the term "processing" in the description of its mining operation on the renewal application for its MELRP, Shakopee could conclude that NBZ meant processing of gravel in regard to its extraction as had been done for the prior three years. The record supports the trial court's finding that NBZ showed no intent to operate a ready-mix plant at the time the MELRP was issued. Shakopee could not be expected to understand the term "processing" in the renewal application to include a ready-mix concrete plant which was specifically excluded from its mining operation in the original application. The trial court's finding was not clearly erroneous.

## II.

■ NBZ argues that the trial court erred in finding that the term "processing of minerals" in zoning ordinance section 11.05, subd. 7 C 6 (mining ordinance) excludes ready-mixing. The interpretation of any existing ordinance is a question of law for the court. *Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608 (Minn.1980). This court is not bound by the trial court's decision when reviewing a question of law. *A.J. Chromy Constr. Co. v. Commercial Mechanical Serv., Inc.*, 260 N.W.2d 579, 582 (Minn.1977).

■ NBZ argues that the term "processing" as used in Shakopee's mining ordi-

nance includes ready-mixing. The mining ordinance, in referring to setbacks, states:

> Processing of minerals shall not be conducted closer than 100 feet to the property line or closer than 500 feet to any residential or commercial structures located prior to commencement of processing operations * * *. Mining operations shall not be conducted closer than 30 feet to the boundary of any zone where such operations are not permitted, nor shall such * * * processing be conducted closer than 30 feet to the boundary of an adjoining property line.

Shakopee, Minn., Zoning Ordinance § 11.-05, subd. 7 C 6 (1989).

While the term "process" is not defined in Shakopee's ordinances, the Minnesota Supreme Court has defined process as:

> to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result.

*Emil Olson, Inc. v. Commissioner of Revenue*, 293 N.W.2d 831, 834 (Minn.1980) (quoting Webster's Third New International Dictionary, at 1808 (Unabridged 1966)).[1] The court considered the crushing, screening, and sizing of virgin gravel to be a method of preparation to effect a particular result. *Id.* The court concluded that by using a certain method, the sand and gravel business operator transformed material unsuitable for construction purposes into crushed gravel of a uniform size so that it could be put to a particular commercial use. *See id.* at 834–35 (crushing, screening and sizing gravel is process within definition of sale pursuant to Minnesota tax law); *see Prior Lake Aggregates, Inc. v. City of Savage*, 349 N.W.2d 575, 578 (Minn.App. 1984) (processing and producing gravel includes crushing, sorting, and washing); *see also Missoula County v. American Asphalt, Inc.*, 216 Mont. 423, 427–28, 701 P.2d 990, 993 (1985) (washing, crushing, screening, and concrete batching are part of gravel processing).

In this case, there was expert testimony that ready-mix is a continuation of the processing of gravel. Other jurisdictions have concluded that ready-mix is a part of a manufacturing process. *See, e.g., Van's Mat'l Co., Inc. v. Dept. of Revenue*, 131 Ill.2d 196, 198–200, 137 Ill.Dec. 42, 44, 545 N.E.2d 695, 697 (1989) (manufacturing process for ready-mix concrete begins when materials are loaded in mixer); *Auxier–Scott Supply Co. v. Oklahoma Tax Comm'n*, 527 P.2d 159, 161 (Okl.1974) (process of manufacturing ready-mix concrete occurs when component materials are combined in mixer).

We believe that, in this case, gravel processing includes only the crushing, sorting, and washing of gravel and not its later use in manufacturing ready-mix concrete. The processing of the on-site gravel is distinct from the manufacturing of the gravel and sand with off-site materials into concrete. The crushing, sorting, and washing of the virgin gravel is a method of preparation producing a particular result. *Emil Olson, Inc.*, 293 N.W.2d at 834. The result is gravel suitable for manufacturing into ready-mix concrete.

Additionally, NBZ's gravel mining operation is located in an area zoned AG which requires a CUP for mining, sand and gravel extraction under Shakopee, Minn., Zoning Ordinance § 11.24, subd. 3 H (1989). Subdivision 3 does not state that a CUP can be issued for a ready-mix concrete plant. *See* Minn.Stat. § 645.19 (1990) (exceptions expressed in law exclude all others). Areas zoned Heavy Industrial District (I–2) do allow a CUP for concrete and ready-mix plants, rock crushing or gravel work, and mining and excavation industries. Shakopee, Minn., Zoning Ordinance § 11.33, subd. 3 F G M (1989). When the mining ordinance is read with the AG zoning ordinance, allowable processing includes sorting, crushing and washing gravel but not ready-mix concrete plants. Ready-mix plants are reserved for areas zoned I–2.

*Emil Olson*, 293 N.W.2d at 834 n. 2 (quoting Black's Law Dictionary, at 1084 (5th ed. 1979)).

---

**1.** The court also defined process as:
mode, method or operation whereby a result is produced; and means to prepare for market or to convert into marketable form.

The original intent of NBZ was to exclude any on-site ready-mix operation. The renewal application does not clearly suggest that ready-mix was being contemplated. Thus, the term processing on NBZ's MELRP renewal application and in the mining ordinance as applied to the NBZ property zoned AG should be read to exclude the ready-mix plant at NBZ's gravel mining operation.

### III.

NBZ argues that a ready-mix operation is a "permitted accessory use" to its sand and gravel operation under City of Shakopee Zoning Ordinance Section 11.24, subd. 4 (1989).

### Accessory Use to Other Permitted Uses

■ NBZ contends that a permitted accessory use "necessary to * * * other permitted uses" in section 11.24, subd. 4 includes accessory uses necessary to other permitted uses and conditional uses.

The permitted uses on property zoned AG do not include mining, sand, and gravel extraction. Shakopee, Minn., Zoning Ordinance § 11.24, subd. 2 (1989). Mining, sand and gravel extraction are conditional uses requiring permit. Shakopee, Minn., Zoning Ordinance § 11.24, subd. 3 H.

Under Shakopee's zoning ordinance, permitted and conditional uses are distinct uses of property. A permitted use is:

[a] use which may be lawfully established in a particular district * * * provided it conforms with all requirements, regulations, and performance standards of such districts.

Shakopee, Minn., Zoning Ordinance § 11.-02, 123 (1981). A conditional use is one which "generally may be appropriate or desirable in a specified zone, but requires special approval." Shakopee, Minn., Zoning Ordinance § 11.02, 121 (1981).

When section 11.24, subd. 4 refers only to permitted uses and not conditional uses, it should be read according to its plain meaning. See Frank's Nursery Sales, 295 N.W.2d at 608 (courts generally construe term according to its plain and ordinary meaning). Section 11.24, subd. 4 allows accessory uses necessary *only* to permitted uses.

### "Subordinate to and Serving" Accessory Use

NBZ argues that its ready-mix concrete plant is an accessory use because it is subordinate to or serving its sand and gravel operation.

■ We do not reach this issue because accessory uses are not permitted for conditional uses and a sand and gravel operation is a conditional use under section 11.24, subd. 3 H. But, even if accessory uses are permitted for conditional uses, the ready-mix concrete plant is not an accessory use as defined in Shakopee's zoning ordinance. Accessory use is:

[a] use * * * subordinate to and serving the principal use * * * on the same lot and customarily incidental thereto.

Shakopee, Minn., Zoning Ordinance § 11.-02, 1 (1981) (emphasis added).

A ready-mix concrete plant is not "subordinate" as being "minor" or "secondary" relative to a gravel mine. Black's Law Dictionary, at 1428 (6th ed. 1991). At trial, there was testimony that a ready-mix plant can operate on any site and does not need to be adjacent to a gravel mine, and the ready-mix plant is necessary to mix various components such as sand, gravel, water, and other chemicals, into a new product, concrete. Additionally, a ready-mix plant does not "serve" the gravel mine by assisting or aiding in the excavation of gravel from the ground. The American Heritage Dictionary, at 1121 (2nd college ed. 1985). However, a ready-mix plant is customarily "incidental" to a gravel mine in that it is regularly "affiliated with the principal use of" and regularly placed on such premises. Black's Law Dictionary, at 762.

But, section 11.02, 1 defines "accessory use" as being both subordinate and serving *and* customarily incidental to the principal use. Although a ready-mix plant is customarily incidental to a gravel mine, it is not subordinate to and serving the excavation of gravel from the ground. Therefore,

a ready-mix concrete plant is not an accessory use.

### Estoppel

 NBZ argues that Shakopee implicitly and explicitly approved an accessory use to NBZ's conditionally permitted sand and gravel operation when it allowed the operation of a wash plant on the property without authorization in the CUP. Even though Shakopee allowed the wash plant on the property, Shakopee is not estopped from preventing other nonconforming uses of the property. *See Ridgewood Dev. Co. v. State*, 294 N.W.2d 288, 292 (Minn.1980) (to establish equitable estoppel, plaintiff must show reliance induced by some language or conduct by defendant, which reliance is to plaintiff's injury, detriment, or prejudice).

### IV.

Shakopee argues that the city council properly revoked NBZ's CUP. The city council based the revocation on four violations of the conditions of the CUP: (1) the presence of the ready-mix plant on the site; (2) the ready-mix plant was not set out in the plan for operation; (3) no environmental assessment worksheet was done on the ready-mix plant; and (4) the ready-mix plant delays the completion of the mining operation.

 On appeal, this court determines whether the zoning authority's action was reasonable. *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 417 (Minn.1981). The nature of the matter under review has a bearing on what is reasonable. *Id.* The focus is on the decision of the city council, independent of the findings and conclusions of the trial court. Thus, this court assesses the legal sufficiency of the reasons given by the city council and determines whether, if legally sufficient, they have a factual basis. *C.R. Investments, Inc. v. Village of Shoreview*, 304 N.W.2d 320, 325 (Minn.1981).

 The threshold issue is whether the reasons given by the city council are legally sufficient. Pursuant to the conditions attached to the CUP, the CUP can be revoked if "the City Council finds that the applicants have substantially, or repeatedly violated the terms of this agreement."

After NBZ erected the ready-mix plant and tested it for one and one-half hours, NBZ did not operate the plant at any time thereafter. The ready-mix plant is merely one small part of NBZ's operation, which otherwise the record shows to be in compliance with the CUP and MELRP.

NBZ did not violate the conditions of the CUP in a material or substantial manner when it immediately ceased operation of the ready-mix plant until a determination of its permissibility under the CUP and MELRP by the courts. Thus, the city council's reasons to revoke the CUP are not legally sufficient.

### DECISION

A ready-mix concrete plant is not permitted under the CUP and MELRP. The CUP is reinstated, as NBZ committed no substantial or repeated violation warranting the revocation of the permit.

Affirmed.