FIFTH DIVISION

JUNE 9, 2000

1-99-2057

ALLIED ASPHALT PAVING COMPANY, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. ) No. 86 CH 3827

)

VILLAGE OF HILLSIDE, ) Honorable

) Lester Foreman,

Defendant-Appellee. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion:

Following a hearing on the Village of Hillside's (Village) motion for a rule to show cause against Allied Asphalt Paving Company (Allied), the circuit court held Allied in contempt of court for operating its Hillside asphalt manufacturing plant in violation of a consent decree (Consent Decree), which the Village and Allied previously had executed to resolve then-pending litigation between those two parties.  Allied appeals the court's findings, arguing that 
(1) the court erred in finding that Allied violated the Consent Decree; (2) the Village brought its rule to show cause motion without proper municipal authorization; and (3) the court erred in refusing to admit evidence offered by Allied at the hearing.

Since 1960, Allied has owned property in Hillside upon which it engages in the manufacture of asphalt.  Allied's Hillside site consists of approximately 15 acres of property west of Mannheim Road and south of the Eisenhower Expressway.  Allied's property is bordered on the west by a vehicle air emissions testing facility.  A number of residences are located adjacent to the south and southwest portions of Allied's property, on which it manufactures new asphalt and recycles used asphalt.
(footnote: 1) 

The genesis of the current proceeding stems from a 1986 suit for declaratory judgment brought by Allied against the Village.  In 1986, Allied was operating its asphalt manufacturing plant in Hillside under a special use permit authorized by a Village ordinance.  One of the conditions of the special use permit was that Allied's "plant facilities, exclusive of office buildings, office accommodations or roadways, be located not less than 400 feet southerly of the southerly line of Congress Street Expressway (now known as the Eisenhower Expressway)" and that "there shall be no extension, addition or new construction of plant facilities and structures, exclusive of office buildings, office accommodations or roadways, beyond the outer perimeter of the land area within which such facilities and structures are [now] located."

In May 1986, the Village Zoning Board of Appeals (Zoning Board) determined at a public hearing that Allied was in violation of its special use permit because it was storing large piles of discarded used asphalt within 400 feet of the southerly line of the Eisenhower Expressway.  The Zoning Board concluded that the used asphalt piles were "plant facilities" and therefore were in violation of the special use permit.  The Zoning Board recommended revocation of Allied's special use permit.

As a result of the Zoning Board's recommendation, Allied filed its 1986 complaint for declaratory judgment, disputing whether the stockpiles of used asphalt constituted "plant facilities."  In resolution of the litigation, the Village and Allied executed the Consent Decree, which provided, 
inter alia
, that the discarded piles of asphalt were excluded from the definition of "plant facilities" under the special use permit.  Although the Consent Decree allowed storage of the used asphalt within the restricted area, the Consent Decree prohibited Allied from stockpiling the discarded asphalt in excess of 26 feet in height.  The Consent Decree further provided that Allied could operate only one "asphalt plant" on its Hillside property and further stated:

"That the plant facilities, exclusive of office buildings, office accommodations or roadways, be located not less than four hundred (400) feet south of the southerly line of the Congress Street Expressway (now known as Eisenhower Expressway ***.

That there shall be no extension, addition or new construction of plant facilities and structures, exclusive of office buildings, office accommodations or roadways, beyond the outer perimeter of the land area within which such facilities and structures are located on the date of this order."

The Consent Decree lastly provided that "this suit is hereby dismissed with prejudice and without costs as to either party, except that the Court shall retain jurisdiction over the parties hereto for the sole purpose of enforcing compliance with the terms of this Consent Decree."

In July 1998, the Village sought a rule to show cause against Allied, alleging that Allied was in violation of the Consent Decree by virtue of its operating a "crushing plant," used to process and recycle the discarded asphalt, within the prohibited 400 feet south of the Eisenhower Expressway.  The Village also alleged that Allied stockpiled discarded asphalt in excess of the 26-feet limit, also in violation of the Consent Decree.

   Responding, Allied agreed that its crushing plant was located within 400 feet of the southerly line of the Eisenhower Expressway, but claimed that "the equipment utilized for the crushing of asphalt within four (400) hundred feet south of the southerly line of the Eisenhower expressway is mobile equipment on wheels and thus does not constitute the construction of any structure or other plant facilities upon its property."

An evidentiary hearing was conducted to determine whether Allied was in violation of the Consent Decree.  At the hearing, the circuit court heard evidence from both Village officials and Allied employees as to nature of the crushing plant, and viewed a videotape of the crushing plant in operation.
(footnote: 2)
The evidence presented at the hearing established that the crushing plant is separate from the actual asphalt plant where the new asphalt is manufactured.  The crushing plant's purpose is to recycle the discarded asphalt into reprocessed asphalt, which is used for roadway base as a substitute for crushed stone; a small portion of the recycled asphalt is also mixed with virgin materials for use in approved grades of recycle mixes.

The crushing plant is described by its manufacturer as a "Portable Crushing & Screening Plant," and weighs 107,000 pounds, is  approximately 64 feet long, 14 feet high and 16 feet wide.  It has the capacity to crush approximately 150 to 300 tons of asphalt per hour.  It contains an impact crusher, a feed hopper, a vibrating feeder, screens and numerous conveyors.  It consists of multiple, separate sections which extend out from its center at right angles.  It is mounted upon a large portable platform with twelve large tires and it is accessible by a ladder and staircase.  Its platform has hydraulic loading and leveling jacks.  It is not one entire piece of machinery, but is instead comprised of several different components used together.

The crushing plant contains an operator platform with a remote control panel to control the operations of the plant.  It is powered by electricity, either hard-wired into existing high voltage power lines or from a diesel generator housed inside a nearby trailer.  Although the crushing plant is mounted on a wheeled platform, it is not self-propelled; it can be moved, however, by semi-tractor truck.  If moved on a roadway, the crushing plant requires a special trailer and an overweight permit.  Prior to moving, certain conveyors and component parts of the crushing plant must be removed and its power source disengaged.  On several occasions since the mid-1980's, Allied has moved the crushing plant to other areas within its property.

To facilitate the recycling process, the crushing plant is located adjacent to the discarded piles of used asphalt, within the disputed 400 feet area.  The crushing, or recycling, process begins when a front-end loader picks up a load of the discarded asphalt from the pile and dumps that load into the crushing plant's hopper.  A conveyor moves the broken asphalt into the jaw crusher, where the irregular pieces of broken asphalt are crushed into smaller, nugget-shaped sizes.  The crushed asphalt then falls onto other conveyors, continuing the process.  For several years, Allied has operated the crushing plant on its property in the same restricted location.  At no time prior to filing its motion for rule to show cause did the Village request that Allied move or cease operating the crushing plant.

At the hearing, there was no dispute that the location of the crushing plant was within the 400 feet restricted area.  The only issue concerned whether the crushing plant was a "manufacturing facility" pursuant to the Consent Decree.  At the conclusion of the hearing, the circuit court found that, despite its mobility, the crushing plant was a "manufacturing facility" within the purview of the Consent Decree.  Accordingly, after finding that there was no showing as to why Allied "should not be held in contempt for failure to abide by the decree," the court entered a finding of indirect civil contempt against Allied, assessing a penalty of $215 per day.   Allied appeals the court's findings.

I

Allied initially contends that the circuit court improperly  held it in indirect civil contempt of court.  Specifically, Allied maintains that the court erred in finding that the crushing plant was a "plant facility" pursuant to the Consent Decree.

In the instant case, the circuit court's finding of contempt was based upon its interpretation of the Consent Decree.  A Consent Decree is considered a contract between the parties and, accordingly, the law of contracts controls its interpretation.  
Flora Bank & Trust v. Czyzewski
, 222 Ill. App. 3d 382, 388, 583 N.E.2d 720 (1991).  Like other contracts, consent decrees must be construed to give effect to the intention of the parties which, when there is no ambiguity in the terms, must be determined from the language of the consent decree alone.  
Flora Bank & Trust
, 222 Ill. App. 3d at 388.  A term will be found to be ambiguous only if it is reasonably or fairly susceptible to more than one interpretation; a term or provision is not rendered ambiguous merely because the parties do not agree on its meaning or application.  
Pennsylvania Life Insurance Co. v. Pavlick
, 265 Ill. App. 3d 526, 529, 637 N.E.2d 1160 (1994).

Allied argues that the crushing plant is not a "plant facility" pursuant to the Consent Decree.  In advancing this position, Allied claims that the crushing plant "fits nicely within the title of construction equipment or contractor's equipment."  Allied also insists that any other interpretation of the crushing plant would render the Consent Decree "absurd."  Nevertheless, a review of the record reveals that the circuit court correctly determined, from the language of the Consent Decree, that the crushing plant was a "plant facility."

To aid its interpretation of the term "plant facility," the circuit court looked to the supreme court's opinion in 
Van's Material Co., Inc. v. Department of Revenue
, 131 Ill. 2d 196, 545 N.E.2d 695 (1989), where 
the court considered the issue of whether the purchase of two ready-mix concrete trucks qualified for a manufacturing tax exemption.  The Department of Revenue argued for a limited interpretation of the term "manufacturing facility," to processes that occur in a fixed location, relying upon its own regulation which stated, "[t]his exemption includes machinery and equipment which replaces machinery and equipment in an existing manufacturing facility as well as machinery and equipment which is for use in an expanded or new manufacturing facility."  
Van's
, 131 Ill. 2d at 205-06.  The 
Van's
 court declined to find that the phrase "manufacturing facility" was limited to activities which occur only in a fixed location.  Instead, the court held:

"While it may be true that one of the definitions of the word 'facility' alludes to its being a place, we also note the following definitions: (1) 'something that promotes the ease of any action, operation, transaction, or course of conduct'; (2) 'something *** that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end.' (Webster's Third New International Dictionary 812-13 (1986)."  
Van's
, 131 Ill. 2d at 206; see also 
Nokomis Quarry Co. v. Department of Revenue
, 295 Ill. App. 3d 264, 692 N.E.2d 855 (1998).

Guided by the language and logic of 
Van's
, the circuit court in the present case concluded that the mere fact that the crushing plant was mounted on wheels and could be moved, albeit with effort, did not necessarily defeat its characterization as a plant or manufacturing "facility."  On the contrary, the court determined that the size, operation and use of the crushing plant together established that it was a manufacturing facility within the purview of the Consent Decree.

Allied criticizes the circuit court's interpretation of and reliance on the supreme court's decision in 
Van's
, which Allied claims is distinguishable from the instant case.  Of course, 
Van's
 involved the interpretation and applicability of the use tax.  Nevertheless, 
Van's
 is instructive.

The undisputed evidence established that the crushing plant was a massive piece of machinery with numerous conveyors and other component parts.  It was neither self-powered nor self-propelled.  It had to be hard-wired to existing power lines or an adjacent generator housed in a trailer.  It could be moved only by a semi-

tractor trailer truck.  Its component parts were installed at its location and it was used to completely recycle discarded asphalt.  Allied's attempts to describe the crushing plant as construction equipment or contractor's equipment flies in the face of reason and logic, particularly where the crushing plant clearly performed a complete manufacturing process--the recycling of used asphalt.  The circuit court did not err in finding that the crushing plant was a plant facility within the purview of the Consent Decree.

Allied also claims that the Village "seeks a sanction for a restriction which is not specifically defined or identified in the Consent Decree" and can claim no "injury as a result of the crushing activity in the current location."  Whether the Village can claim "injury" is irrelevant; the only question before the circuit court was whether Allied violated the terms of the Consent Decree.  The Consent Decree is specific as to the restricted activity in the prohibited area:  
Allied could operate only one asphalt plant on its property and was prohibited from extending, adding to or constructing new facilities onto the existing asphalt plant beyond the current outer perimeter of the asphalt plant.  The Consent Decree also provided that "the plant facilities *** be located not less than four hundred (400) feet south of" the Eisenhower Expressway.  Simply because the Consent Decree did not define the phrase "plant facility" does not render it  unenforceable.

Allied also claims that the circuit court's finding runs counter to applicable principles of zoning and land use law. Specifically, Allied maintains that forcing it to move the crushing plant from the northern boundary of its property to the southern or southwestern boundaries would place the crushing plant in closer proximity to residential areas, in contravention of established land use and zoning principles.  Nevertheless, as the court noted, it was not determining land use or zoning issues, but was interpreting the Consent Decree which both the Village and Allied had executed.  Accordingly, Allied's argument in this regard fails.

Allied also urges that the Consent Decree lacks the specificity required for a finding of contempt and that its conduct  was not willful; therefore, imposition of sanctions was improper.  Notwithstanding Allied's position, the Consent Decree was sufficiently clear and specific as to the conduct and activity prohibited.  Moreover, whether Allied's conduct was willful is irrelevant; the circuit court found Allied in civil, not criminal, contempt, and its imposition of sanctions was prospective and not punitive.  See 
City of Mattoon v. Mentzer
, 282 Ill. App. 3d 628, 636, 668 N.E.2d 601 (1996) ("A civil contempt order is coercive, not punitive, and is designed to bring a defendant's conduct in line with a prior court order.").

Whether a party has committed indirect civil contempt is a question of fact for the circuit court which will not be overturned on appeal unless against the manifest weight of the evidence.  
Busey Bank v. Salyards
, 304 Ill. App. 3d 214, 217, 711 N.E.2d 10 (1999).  In the instant case, the circuit court's determination was not against the manifest weight of the evidence where that evidence revealed that Allied violated the Consent Decree by operating the crushing plant, a "plant facility," within the prohibited 400-feet area south of the Eisenhower Expressway. 

II

Allied also asserts that the Village did not properly authorize the "prosecution of this action."  Specifically, Allied complains that the Village, prior to moving for a rule to show cause, never conducted an open meeting during which the subject was addressed.  The Village initially responds that the appropriate public body authorized the legal action in a closed portion of one of its public meetings.  Alternatively, the Village  contends that the present case does not involve a final municipal decision to file a lawsuit, but only involves the filing of a motion in pending case.

Here, on the fourth day of the evidentiary hearing, after several witnesses already had testified, Allied sought leave of the circuit court to file its amended affirmative defenses, in which it claimed that the Village's motion was "filed by its attorney 
without
 the Village, acting through its Board of Trustees, having passed an appropriate form of motion, resolution, ordinance or other form of action during the course of an open and public meeting authorizing or approving such action."  (Emphasis in original).  Although the court granted Allied leave to file, the court later found Allied's position to be without merit:

"I am making a finding at this time that what is before me is the continuation and further advancing of litigation that was filed in the year 1986.  There was a decree entered in this case in 1989.  This is not a new case.  This is not new litigation.  This is not the inception of litigation.  This is the further advancement of a lawsuit that was filed in 1986, and I take the position that what I am dealing with here is a supplemental proceeding in a previously-filed lawsuit.  Therefore, I find it not necessary for new authorization by the legislative branch of the government in Hillside.  The very number of the case, it's a 1986 case, not a case that was filed in 1998, it's not a case filed in 1999.  There was no necessity for refiling.  All they did is serve papers in an existing lawsuit."

The Open Meetings Act (5 ILCS 120/1 
et seq.
 (West 1996)), upon which Allied relies, provides that when litigation has been filed and is pending before a court, the public body may hold closed meetings to consider that litigation and issues relating to it.  5 ILCS 120/2(c)(11) (West 1996).  The circuit court correctly recognized that the Village's rule to show cause motion emanated from "pending litigation."  Moreover, as is evident from the Consent Decree, the court retained jurisdiction over the parties to resolve any disputes and enforce compliance of the Consent Decree. Accordingly, Allied's contention in this regard also fails.

III

Allied finally argues that the circuit court erred in refusing to consider evidence offered by Allied that Village officials knew of the location of the crushing plant for years before filing the rule to show cause.  Allied contends that this evidence "might have been instructive on whether [the Village] deemed its location to be in violation of the consent decree."  The Village responds that such evidence was irrelevant to the issue of whether Allied violated the Consent Decree.

When Allied attempted to elicit testimony that Village officials had been aware of the location of the crushing plant for years, yet had neither notified Allied nor invoked the Consent Decree to prohibit Allied's use of the crushing plant, the circuit court forestalled the inquiry, finding it irrelevant.  Although not relying upon a theory of estoppel, Allied instead argued that evidence of the Village's conduct was relevant in determining the Village's own interpretation of the Consent Decree.

Nevertheless, the Village's prior knowledge of the crushing plant has little relevance to the instant inquiry.  The exclusion or admission of evidence rests within the discretion of the circuit court and will not be reversed absent an abuse of that discretion.  
Wojcik v. City of Chicago
, 299 Ill. App. 3d 964, 975, 702 N.E.2d 303 (1998).  Here, the court did not abuse its discretion in excluding evidence irrelevant to the actual issue in the case, namely, whether the crushing plant was a plant facility pursuant to the Consent Decree and whether the present location of the crushing plant violated the conditions contained in the Consent Decree.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed. 

THEIS, P.J., and GREIMAN, J., concurring.

FOOTNOTES
1:
The process by which Allied manufactures new asphalt involves the mixing of stone and sand aggregate, brought by conveyer to a heating drum.  After heating, the stone and sand mixture is then distributed across a set of screens and into storage bins, where it is equally proportioned and distributed into another mixer where liquid asphalt is added.  After further mixing, the end material is either dumped into a truck or into a slat conveyor which takes the finished product into storage silos.

The machinery by which the new asphalt is manufactured comprises the asphalt plant and, for the most part, is not enclosed within a building, with the exception of the enclosed "pug mill" where the heating of the asphalt takes place.  The components of the asphalt plant include a feed hopper system, which drops the product into a fixed conveyor; the fixed conveyor brings the product to a dryer and then feeds the product into the tower, which contains a screening deck and the pug mill mixer.  The asphalt plant also contains a "bag house," which filters the exhaust air, asphalt tanks which store the liquid asphalt, and a silo system which holds the final product.  All these components are stationary and fixed to a cement foundation.  The recycling of discarded and used asphalt does not take place within the asphalt plant.

2:
The circuit court also heard extensive evidence as to whether Allied was stockpiling used asphalt in excess of the height limit.  Allied, however, does not appeal the circuit court's finding as to the height of the discarded piles of asphalt.