# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. R.J. Reynolds Tobacco Co.**, 2011 IL App (1st) 101736

---

Appellate Court
Caption

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. R.J. REYNOLDS TOBACCO COMPANY, Defendant-Appellee (Philip Morris, Inc.; American Tobacco Company, Inc.; Brown and Williamson Tobacco Corporation; Liggett & Myers, Inc.; Lorillard Tobacco Company, Inc.; United States Tobacco Company; B.A.T. Industries, P.L.C.; British American Tobacco Company, LTD; Hill and Knowlton, Inc.; The Council for Tobacco Research-U.S.A.; and Tobacco Institute, Inc., Defendants).

District & No.

First District, Fourth Division
Docket No. 1–10–1736

Filed

June 30, 2011

Held

(Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.)

On appeal from proceedings arising from a motion for a rule to show cause why defendant tobacco company should not be held in contempt for violating a consent decree prohibiting the company from using a cartoon in a promotional campaign, the appellate court held that the images defendant used in its campaign published in a magazine were cartoons, since they depicted man-made objects with unnatural abilities, and thereby violated the "Ban on Use of Cartoons" provision of the settlement agreement incorporated into the consent decree, and the trial court did not abuse its discretion in striking sanctions when defendant suspended the campaign, but the cause was remanded for a determination of the amount of attorney fees and costs that would be appropriate as relief for the violation.

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 96–L–13146; the Hon. Dennis J. Burke, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Paul Berks, Assistant Attorney General, of counsel), for the People. |
| | Kirkland & Ellis LLP, of Chicago (Andrew R. McGaan, P.C., and Rana Barakat, of counsel), and Jones Day, of Washington, D.C. (Noel J. Francisco and Hashim M. Mooppan, of counsel), for appellee. |
| Panel | JUSTICE STERBA delivered the judgment of the court, with opinion. Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1     This appeal arises from R.J. Reynolds Tobacco Company's (Reynolds) advertisements in Rolling Stone magazine's Fortieth Anniversary issue and images Reynolds used in its "Camel Farm" promotional campaign. The State of Illinois filed a motion for a rule to show cause why Reynolds should not be held in contempt for violating a consent decree when Reynolds used a "cartoon" in its "Camel Farm" campaign. The State contends that the circuit court erred when it ruled that Reynolds did not use a "cartoon" because the images in the "Camel Farm" advertisements did not portray superhero-like powers. The State also claims that Reynolds violated the consent decree when Rolling Stone used a "cartoon" in its editorial, which was located in close proximity to Reynolds' advertisement in the magazine. The State contends that Reynolds had an affirmative duty to inform Rolling Stone that it could not use a "cartoon" in its publication near Reynolds' advertisements. For the reasons that follow, we affirm in part and reverse in part and remand the cause for further proceedings.

¶ 2                                    BACKGROUND
¶ 3     Reynolds is a leading manufacturer of tobacco products. In November 1996, the State of

Illinois along with 39 other states sued Reynolds and other tobacco manufacturers seeking damages and injunctive relief alleging that the tobacco manufacturers intentionally targeted minors through their marketing and promotional campaigns and that they concealed from the public information regarding the harmful health impacts of smoking and the addictiveness of nicotine. On November 23, 1998, Reynolds executed a master settlement agreement (MSA) with designated State officials from the 40 states that initiated the litigation against it. The MSA included a "Prohibition on Youth Targeting" provision, which prohibited the promotion or marketing of tobacco products to individuals under the age of 18. The MSA also prohibited Reynolds from the "use or cause to be used any Cartoon in the advertising, promoting, packaging or labeling of Tobacco Products." The MSA in section II, subsection (l), defines the term "cartoon" as:

"any drawing or other depiction of an object, person, animal, creature or any similar caricature that satisfies any of the following criteria:

(1) the use of comically exaggerated features;

(2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or

(3) the attribution of unnatural or extrahuman abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation.

The term 'Cartoon' includes 'Joe Camel,' but does not include any drawing or other depiction that on July 1, 1998, was in use in any State in any Participating Manufacturer's corporate logo or in any Participating Manufacturer's Tobacco Product packaging."

¶ 4　Reynolds and the State executed a consent decree adopting the MSA's provisions, including the prohibition on the use of "cartoons" and the definition of a "cartoon." On December 8, 1998, the circuit court approved and entered the consent decree and final judgment. The circuit court retained jurisdiction to implement and enforce the consent decree.

¶ 5　Reynolds released a new promotional campaign in 2006 called the "Camel Farm," which was created to show Reynolds' support of independent music and record labels. As part of the "Camel Farm" campaign, Reynolds sponsored concerts, created a "Camel Farm" website, sent direct mailings, and placed advertisements in print media, including Rolling Stone's Fortieth Anniversary issue published on November 15, 2007.

¶ 6　Reynolds' advertisement in Rolling Stone was entitled "the FARM [F]REE RANGE MUSIC." "COMMITTED TO SUPPORTING & PROMOTING INDEPENDENT LABELS" was printed in the advertisement. "THE BEST MUSIC RISES FROM THE UNDERGROUND" was stated in a banner. Beneath the banner in a box was the following language:

"The world of independent music is constantly changing. New styles and sounds emerge daily. That's why we're bringing you The FARM. A collaboration between Camel and independent artists and record labels. It's our way of supporting these innovators as they rise up to bring their sounds to the surface. We give them more opportunities to be heard through online music and countless events across the nation."

¶ 7    The images in the "Camel Farm" advertisement focused primarily on a music and entertainment theme by displaying radios and speakers rising from the grass on top of flower stems, film reels as tires on a tractor, a record player placed on top of a tractor and a radio bearing propellers flying through the sky. The images were set in a green grassy pasture meeting a serene blue sky. The images also created a retro feel because the tractor, radios and speakers looked old-fashioned.

¶ 8    Reynolds' advertisement in Rolling Stone was a "gatefold" advertisement that encompassed four pages, including a front page, two pages that folded inward and met in the middle and a back page. To access a Rolling Stone editorial, a reader had to open and unfold outward both of Reynolds' folded pages, one of which opened outward to the right and the other opened outward to the left. Rolling Stone's editorial encompassed five pages, four of which were on the reverse side of Reynolds' "gatefold" advertisement. Rolling Stone's editorial was entitled "Indie Rock Universe" and consisted of hand-drawn cartoon images and captions, such as "Angry Red Plant–Fight the Power Against Me!," "The Bearded Men of Space Station Eleven–The final frontier of awesome facial hair," and "The Bearded Ladies of Space Station Eleven–She came from Planet Claire–or maybe she's just kind of weird." Reynolds did not create the images in Rolling Stone's editorial.

¶ 9    The images in a video created by Reynolds and shown at concerts in Chicago contained images of farm animals, a woman with numerous tattoos and blue hair, a woman with bright red hair, a radio with affixed propellers flying across the screen and a tractor with film reels for tires and emitting musical notes from a record player placed on top of it moving across the screen. Reynolds also created a website that was found at http://www.thefarmmusic.com. The website contained images of birds, butterflies and appearing on each screen of the website was a tractor with airplane propellers attached to it.

¶ 10    On December 4, 2007, the State filed an "Emergency Motion to Enforce the Consent Decree and Final Judgment and the Master Settlement Agreement, for a Rule to Show Cause, for a Temporary Restraining Order, and for Penalties and Sanctions Against R.J. Reynolds Tobacco Co."[1] The State alleged that Reynolds "used or has caused the use of numerous

---

[1]The following eight states initiated similar claims against Reynolds: Maryland, New York, Connecticut, California, Washington, Maine, Ohio and Pennsylvania. A settlement agreement was executed between Reynolds and the following states: Maryland (agreement executed on January 26, 2010); New York (agreement executed on March 23, 2010); and Connecticut (agreement executed on March 24, 2010). The California Court of Appeals held that the images in the "Camel Farm" campaign were a "cartoon" because the images depicted objects with unnatural abilities. *In re Tobacco Cases I,* 111 Cal. Rptr. 3d 313, 318 (2010). The Washington Court of Appeals held that the photo collage images in the "Camel Farm" campaign violated the plain language of the MSA and were a "cartoon" because the imagery "depends entirely upon suspension of the laws of nature." *State v. R.J. Reynolds Tobacco Co.*, 211 P.3d 448, 453 (Wash. Ct. App. 2009). The Washington Court of Appeals also held that "Reynolds did not affirmatively cause *Rolling Stone's* use of cartoons" because "[n]o provision of the MSA or the consent decree applies to or imposes restrictions upon third parties." *Id*. at 453. The Commonwealth Court of Pennsylvania held that the images in the "Camel Farm" campaign were not a "cartoon" because the images did not "illustrate

Cartoons in its advertisements for Camel cigarettes by purchasing advertising involving Cartoons in the November 15, 2007 Fortieth Anniversary Edition of Rolling Stone Magazine; featuring Cartoon images on a promotional website RJR created; and displaying Cartoon images at a free promotional concert within the State." The State sought the relief provided for in the MSA consisting of injunctive relief, monetary payments, *cy pres* remedies, and costs and attorney fees. Specifically, the State sought a civil sanction of $6.5 million based on the following: "(1) $100 for each of the estimated 65,700 copies of the Rolling Stone Magazine 40th Anniversary issue distributed in the State; (2) $100 for each Illinois resident registered on 'The Farm' website; and (3) $100 per concert attendant for the impermissible use of Cartoon advertising at the November 21 Concert."

¶ 11    The circuit court entered an agreed order on December 5, 2007, whereby the parties agreed that the State would withdraw the temporary restraining order and other emergency relief set forth in its motion because Reynolds agreed to: "(i) suspend distribution of music CDs, (ii) no longer use Camel Farm imagery at music events and (iii) suspend operation of thefarmrocks.com website, until this matter is resolved." Reynolds also agreed to suspend use of the "Camel Farm" imagery in print advertising for the remainder of 2007.

¶ 12    Reynolds filed a motion to dismiss asserting that the State failed to abide by the detailed process of presuit consultation and negotiation and 30-day written notice set forth in the consent decree and MSA before filing its motion. Reynolds also asserted that Illinois contempt law precludes the State's requested relief of $6.5 million in punitive damages and that Reynolds did not violate the consent decree or MSA. Reynolds requested the circuit court to strike the State's request for monetary damages. On September 3, 2008, the circuit court denied Reynolds' motion to dismiss, but struck the State's $6.5 million sanction request because the requested sanction was punitive in nature and, thus, unavailable in the civil contempt proceeding. The circuit court reasoned that the State's requested $6.5 million sanction was to punish Reynolds for its alleged violation of the consent decree. The circuit court also stated that the State's claim that Reynolds violated the consent decree amounted to a breach of contact claim and punitive damages are not recoverable in such contractual claims.

¶ 13    On February 9, 2009, the State and Reynolds executed a stipulation regarding the pending litigation. The parties stipulated that "Reynolds did not prepare or preview the five pages of

the types of super-hero-like powers that are particularly attractive to youth." *Commonwealth ex rel. Fisher v. Philip Morris, Inc.*, 4 A.3d 749, 756 (2010). The Pennsylvania court also stated that "[n]othing in the "*Camel Farm's* surrealistic, photographic, sophisticated imagery can be said to encompass the allure of cartoons, let alone meet the definition contained in the MSA." *Id*. Focusing on the images in the Rolling Stone editorial, the Ohio Court of Appeals held that Reynolds did not engage "in affirmative conduct such that it used or caused to be used the cartoons in the Rolling Stone editorial content." *State ex rel. Corday v. R.J. Reynolds Tobacco Co.*, No. 09AP–259, slip op. at 8 (Ohio Ct. App. Jan. 14, 2010). The Maine circuit court ruled that the "Camel Farm" imagery was not a "cartoon" because "[n]one of the Camel Farm imagery involves any of the 'super-hero' like powers embraced" within the "cartoon" definition. *State v. R.J. Reynolds Tobacco Co.,* No. CV–97–134 (Me. Jan. 9, 2009).

illustrations entitled 'Indie Rock Universe' that appeared in the November 15, 2007, Fortieth Anniversary issue of Rolling Stone." The parties also stipulated that "There is no evidence that Reynolds or any Reynolds employee or agent, specifically intended to create advertising copy containing 'cartoons' in violation of the MSA and/or Consent Decree, or specifically intended for Rolling Stone to publish 'cartoons' in its editorial content adjacent to Reynolds' advertising copy in violation of the MSA and/or Consent Decree." The parties further stipulated that "The State had not identified any provision of the MSA and/or Consent Decree that applies to, or imposes restrictions upon, third-parties–including consumer magazines such as Rolling Stone–independent of the obligations imposed directly upon a Participating Manufacturer."

¶ 14 After an evidentiary hearing, the circuit court entered a written memorandum opinion and order on January 15, 2010. Focusing on the prohibition against Reynolds to "use or caused to be used" a "cartoon" and the "cartoon" images that Rolling Stone used in its editorial, the circuit court held that Reynolds did not violate the MSA because it had no duty to inform publishers about the "cartoon" ban. The State filed a motion to reconsider because the circuit court's order did not rule on whether the images used in the "Camel Farm" campaign were "cartoons." The circuit court granted the motion for reconsideration. On May 19, 2010, the circuit court issued a supplemental order finding that Reynolds' images were not "cartoons" because the images did not depict superhero-like powers similar to the examples listed in the definition of "imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation." The State timely appealed.

## ANALYSIS

¶ 15 The State contends on appeal that the images displayed in Reynolds' "Camel Farm" advertisements were "cartoons" as defined by the consent decree and MSA. The State maintains that the circuit court erred when it ruled that Reynolds' images were not "cartoons" because the images did not project superhero-like abilities. The State claims that the "Camel Farm" promotion was alluring to young smokers because it portrayed Camel as the "cool/hip" brand of cigarettes that sponsors "cool/hip" music groups. The State contends that the purpose underlying the "cartoon" ban was to prevent tobacco companies from using "unnatural" or "extra-human" characteristics to target youths and the prohibition should not be construed narrowly to ban only images that portray superhero-like powers.

¶ 16 In response, Reynolds claims that the "Camel Farm" images do not portray the superhero-type powers included as examples of "cartoons" in the consent decree and MSA's definition of that term. Employing the canons of statutory interpretation of *ejusdem generis*[2] and

---

[2]*Ejus generis* stands for the proposition that "when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the word 'other' is interpreted as meaning 'other such like.' " *People v. Davis*, 199 Ill. 2d 130, 138 (2002) (quoting *Farley v. Marion Power Shovel Co.*, 60 Ill. 2d 432, 436 (1975)).

*noscitur a sociis*,[3] Reynolds claims that only images displaying abilities of a similar or like kind to "imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation" are prohibited. Reynolds also claims that "unnatural or extrahuman abilities" consists of one unitary phrase not intended to mean unnatural abilities or extrahuman abilities. Reynolds maintains that the "imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation" characteristics modify the term "abilities" and are examples of "unnatural or extrahuman abilities." Since the "Camel Farm" images do not contain superhero-like powers, which would be alluring to youths, Reynolds claims that its images are not "cartoons." Reynolds also claims that although it waived any constitutional claims, including the right to free speech, in the MSA, the waiver's language must be narrowly construed.

¶ 17    A consent decree entered by a court adopting a settlement agreement is considered a contract. *People v. Scharlau*, 141 Ill. 2d 180, 195 (1990). Consent decrees should not be characterized as a court order, but instead a contractual agreement "controlled by the law of contracts." *Id*. A consent decree must be interpreted giving effect to the words used in the decree and the parties' intention underlying the decree. *Allied Asphalt Paving Co. v. Village of Hillside*, 314 Ill. App. 3d 138 (2000). The interpretation of a contract involves a question of law, and as such, we employ a *de novo* standard of review. *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 448 (2009).

¶ 18    The term "cartoon" is defined in section II, subsection (l), of the MSA as:

"any drawing or other depiction of an object, person, animal, creature or any similar caricature that satisfies any of the following criteria:

(1) the use of comically exaggerated features;

(2) the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique; or

(3) the attribution of unnatural or extrahuman abilities, such as imperviousness to pain or injury, X-ray vision, tunneling at very high speeds or transformation."

¶ 19    Reynolds' images in Rolling Stone do not depict "comically exaggerated features" or "the attribution of human characteristics to animals, plants or other objects, or the similar use of anthropomorphic technique." The third criterion is relevant here, which is "the attribution of unnatural or extrahuman abilities" to an object, person, animal, creature or any similar caricature. Relevant to this appeal is understanding the meaning of the term "unnatural."

¶ 20    The MSA does not define the term "unnatural." An undefined term in a contract may be either ambiguous or unambiguous. A term is "ambiguous only if it is reasonably or fairly susceptible to more than one interpretation." *Allied Asphalt Paving Co.*, 314 Ill. App. 3d at 144. The inability of parties to agree to the meaning or application of a term, however, does not render the term ambiguous. *Id*. An unambiguous term "conveys a clear and definite

---

[3]*Noscitur a sociis* is a doctrine providing that "[t]he meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." *Hayes v. Mercy Hospital & Medical Center*, 136 Ill. 2d 450, 477 (1990).

meaning." *Department of Corrections v. Civil Service Comm'n*, 187 Ill. App. 3d 304, 309 (1989). The term "unnatural" in the definition of "cartoon" is not ambiguous. As such, the term "unnatural" is defined according to its plain and ordinary meaning. *Covinsky v. Hannah Marine Corp.*, 388 Ill. App. 3d 478, 484 (2009). The plain and ordinary meaning of the term "unnatural" is:

"1. Contrary to the laws or course of nature. 2. At variance with the character or nature of a person, animal, or plant. 3. At variance with what is normal or to be expected: the unnatural atmosphere of the place. 4. Lacking human qualities or sympathies; monstrous; inhuman; an obsessive and unnatural hatred. 5. Not genuine or spontaneous; artificial or contrived; a stiff, unnatural manner. 6. *Obs*. Lacking a valid or natural claim; illegitimate." Webster's Unabridged Dictionary 2081 (2d ed. 1998).

¶ 21    Images of objects in the "Camel Farms" advertisement are "unnatural" and, thus, constitute a "cartoon," as defined in the MSA. While a woman driving a tractor with film reels for tires is "unnatural" because it varies from what is normal or expected, this image has the potential to be engineered and thus does not depict an unnatural ability. However, an eagle flying with a hand protruding from a picture frame clutched in the eagle's claws is "unnatural" because it varies from what is normal or expected.

¶ 22    Moreover, the images of radios, speakers and a television, which have a unifying trait of emitting sound, are also "unnatural." In the advertisement, radios, speakers and a television are each placed on a plant stem to resemble flowers and to be representative of seedlings rising from the underground. This "flower" image is symbolic of independent music that, according to the language in the banner adjacent to the "flowers," "rises from the underground." The "Camel Farm" promotion expressly communicated to music fans that Reynolds supports independent music innovators "as they rise up to bring their sounds to the surface," which was portrayed in the advertisement by depicting man-made objects, such as radios, speakers and a television, as growing from the underground and rising to the surface, much like a seedling growing from the underground and rising to the surface as a flower. In the advertisement, the "flowers" continue to grow and then develop or bloom propellers, which is evident by the placement of a propeller on top of a "radio flower" that is still attached to its stem. This developmental change of the "flower" reflects the advertisement's language stating that the "world of independent music is constantly changing." In the final stage of developmental change for the "flower," the "flower" becomes airborne, which is also evident by the radio bearing a propeller soaring through the sky much like a bird or butterfly.

¶ 23    It is significant to note the placement of three birds on top of the sound-emitting devices, an eagle soaring through the sky above the man-made objects and butterflies flying next to the propelled radio. These creatures all fly, and radios on the "Camel Farm" do as well. Indeed, it is beyond mere coincidence that the radio which sprouted propellers is flying through the sky in close proximity to two butterflies, which are commonly recognized as a symbol of transformation and change. A butterfly's transformation from a caterpillar is a natural process, unlike the growth and transformation of the "flowers" here, which depict an unnatural ability. The transformation of the man-made objects described above is unnatural because it is contrary to the laws or course of nature and varies from what is normal or to be expected. Because of the unnatural ability of the objects portrayed in the advertisement to

transform into a flying "flower," the advertisement is a "cartoon."

¶ 24     The images of these man-made objects in the advertisement in conjunction with the advertisement's express language create a uniform theme of change and transformation. The "Camel Farm" advertisement is a "cartoon" not only because of the unnatural ability of the objects portrayed in the advertisement to grow like "flowers," but also because of the objects' transformation depicted in the advertisement. Transformation was expressly listed as an example of an "unnatural or extrahuman ability" in the definition of "cartoon." Similar to the term "unnatural," the term "transformation" is also unambiguous. The plain and ordinary meaning of the term "transformation" is:

> "1. The act or process of transforming. 2. The state of being transformed. 3. Change in form, appearance, nature, or character." Webster's Unabridged Dictionary 2010 (2d ed. 1998).

¶ 25     As stated above, the pictorial set forth in the "Camel Farm" advertisement depicts four stages of the transformation of a man-made object into a "flower." The first stage of the transformation presumptively is the seedling stage. Next, a stem and flower bud grow from the seedling to rise up above the ground. Then, the "flowers" sprout propellers. Finally, the "flowers" with an attached propeller break from their stems and take flight, which is demonstrated by the propelled radio flying through the sky. This transformation provides a visual image of the "Camel Farm" campaign that supports the "world of independent music, [which] is constantly changing."

¶ 26     Reynolds contends that the unnatural or extrahuman abilities portion of the "cartoon" definition should be limited to superhero-like powers and that "unnatural or extrahuman abilities" should be interpreted as a unitary phrase. Although superhero-like powers may be characterized as unnatural or extrahuman, objects having "unnatural or extrahuman abilities" should not be limited only to objects having superhero-like powers. If the MSA's and consent decree's drafters intended to limit "cartoons" to objects having superhero-like powers or abilities only, then such a limitation would have been expressly provided for in the definition. Moreover, adopting Reynolds' reading of the definition of "cartoon" is contrary to the express language used in the definition because it converts the disjunctive conjunction "or" chosen by the drafters into the conjunction "and." Both unnatural and extrahuman abilities are not required for the depiction of an object to be a "cartoon." Instead, the depiction must attribute either unnatural or extrahuman abilities to an object. Here, Reynolds attributed unnatural abilities to objects. Moreover, the unnatural ability that Reynolds attributed to the objects included transformation, which was specifically enumerated in the definition of "cartoon" as an example of an unnatural or extrahuman ability. Reynolds urges application of the *ejusdem generis* and *noscitur a sociss* statutory construction doctrines to interpret the definition's language, but doing so is not necessary since the definition's language is not ambiguous. Based on the MSA's and consent decree's definition of "cartoon", the "Camel Farm" advertisement is a "cartoon."

¶ 27     We agree with the Washington Court of Appeals where it stated in a companion case that "the Camel Farm photo collage does not resemble traditional Disney cartoons, but this is not germane. Disney-type cartoons were not the only target of the prohibition. Nor is it germane

that the effect is thought-provoking rather than humorous." *State of Washington*, 211 P.3d at 452. The "Camel Farm" campaign was indeed thought provoking and its music-inspired theme would appeal to youths. This court's conclusion that the "Camel Farm" campaign contained "cartoons" upholds the drafters of the MSA's intent to prohibit images alluring to youths in tobacco advertisements. The images in the "Camel Farm" advertisements would be alluring to a youth who also supports independent music and record labels, which likewise purport to be "constantly changing."

¶ 28    Although the "Camel Farm" advertisement in Rolling Stone contained a "cartoon," the video and website did not contain a "cartoon." The State claims that images in the video were a "cartoon" because it contained images with "comically exaggerated features" violating the first criterion of the "cartoon" definition. Reynolds responds that the images were not a "cartoon" because the images were not comical.

¶ 29    The video contained images of a tractor with film reels as tires, a record player emitting musical notes placed on the tractor appearing to resemble an exhaust pipe, a woman with tattoos and blue hair, a radio moving around the screen by rotating propellers, flashing images of a Camel and a woman with bright red hair flashing on and off of the screen. Many images appeared in the video and then disappeared, while other images flashed on and off of the screen and rotated around the screen. None of the images displayed "comically exaggerated features," especially in comparison to the comically exaggerated features of "Joe Camel." The human images in the video do not portray any exaggerated human characteristics, but rather are normal in appearance, nor are the animals in the video caricatures. The State places emphasis on the blue and red hair of the women depicted in the video and asserts that the color choices were intended to be comical. Independent music fans viewing this video at a concert would not likely perceive red or blue hair on a woman as a "comically exaggerated feature." Accordingly, the images in the video are not a "cartoon." Similarly, the images on "thefarmmusic.com" website were also not a "cartoon" because none of the images portrayed "comically exaggerated features." Many of the images on the website were the same images included in the video, which as stated, were not a "cartoon." Based on this conclusion, it is not necessary to address whether the State acquiesced in the use of the images or whether the parties' course of performance demonstrates the State's approval of the images since the images in the video were not a "cartoon." Also, the State did not view the "Camel Farm" advertisement in Rolling Stone in its entirety, and viewing isolated images would not adequately reveal the problematic unifying and dominate idea of change and transformation. As such, Reynolds lacks a sufficient basis to claim that the State acquiesced in the use of the advertisement.

¶ 30    On appeal, Reynolds also claims that the "cartoon" ban constitutes a partial waiver of its first amendment free speech rights. Reynolds acknowledges that the MSA contains a waiver of its constitutionally protected free speech rights because it agreed to refrain from using "cartoons" in the promotion or advertising of its products.[4] Reynolds claims, however, that

---

[4]Section XV of the MSA addresses the waiver of constitutional rights, and states the following:

the waiver should be narrowly construed and apply only to speech that is within the clear and unambiguous terms of the waiver.

¶ 31    As previously stated, the "Camel Farm" campaign published in Rolling Stone contains "cartoons." Reynolds' images attributed unnatural abilities, which included transformation, to objects. The attribution of those characteristics to an object falls squarely within the definition of "cartoon." According to the permanent relief section of the MSA, subsection (b), Reynolds may not "use or cause to be used any Cartoon in the advertising, promotion, packaging or labeling of Tobacco Products." Reynolds expressly waived its free speech rights regarding its use of a "cartoon" and the ban on the use of a "cartoon" falls within the waiver's clear and unambiguous terms even construing the language narrowly as urged by Reynolds.

¶ 32    In sum, Reynolds violated the MSA and consent decree because the "Camel Farm" advertisement in Rolling Stone consisted of a "cartoon." The images in the video and on the website, however, were not a "cartoon." The man-made objects in the "Camel Farm" advertisement in Rolling Stone possess the unnatural ability to grow and transform into "flowers" that ultimately become airborne. The MSA adopted by the consent decree expressly and clearly prohibited the use of "cartoons" in "the advertising, promoting, packaging or labeling of Tobacco Products." The consent decree stated that the circuit court retained jurisdiction to implement and enforce the consent decree and underlying agreement. The consent decree permitted the State to seek an order for monetary, civil contempt or criminal sanctions for any claimed violation. The circuit court, however, "in its discretion may determine not to enter an order for monetary, civil contempt or criminal sanctions." A circuit court abuses its discretion if "no reasonable person would take the view adopted by the trial court." *Bruce v. Atadero*, 405 Ill. App. 3d 318, 323 (2010). The consent decree further stated that in any proceeding resulting in a finding that Reynolds violated the consent decree, Reynolds "shall pay the State's costs and attorney fees incurred by the State of Illinois in such proceeding."

---

"The Settling States and the Participating Manufacturers acknowledge and agree that this Agreement is voluntarily entered into by each Settling State and each Participating Manufacturer as the result of arm's-length negotiations, and each Settling State and each Participating Manufacturer was represented by counsel in deciding to enter into this Agreement. Each Participating Manufacturer further acknowledges that it understands that certain provisions of the Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement, it (and the Tobacco-Related Organizations (or any trade associations formed or controlled by any Participating Manufacturer)) waives for purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions. Provided, however, that nothing in the foregoing shall constitute a waiver as to the entry of any court order (or any interpretation thereof) that would operate to limit the exercise of any constitutional right except to the extent of the restrictions, limitations or obligations expressly agreed to in this Agreement or the Consent Decree."

¶ 33     The circuit court exercised its discretion when it struck the State's $6.5 million sanction request on the basis that the requested sanction was punitive in nature, which is a remedy available in criminal contempt and not civil contempt. The circuit court did not abuse its discretion in striking the request for sanctions because civil contempt is coercive rather than punitive in nature and "is designed to bring a defendant's conduct in line with a prior court order." *City of Mattoon v. Mentzer*, 282 Ill. App. 3d 628, 636 (1996). Here, Reynolds voluntarily suspended its "Camel Farm" campaign when legal proceedings were initiated against it. Thus, Reynolds' conduct became consistent with the consent decree's and MSA's terms because it suspended use of alleged "cartoons" in promoting its tobacco products. According to the consent decree, the State is entitled to costs and attorney fees if Reynolds was found to be in violation of the consent decree. Here, Reynolds violated the consent decree because it used a "cartoon" in the "Camel Farm" campaign. Accordingly, this matter is remanded to the circuit court to determine the appropriate relief consistent with this disposition.

¶ 34     The State also claims on appeal that Reynolds used or "caused to be used" the cartoons appearing in the Rolling Stone's editorial pages to promote its tobacco products. The State bases this claim on the fact that the "Camel Farm" advertisement was a gatefold that readers must touch and open before being able to read the Rolling Stone editorial. The State contends that Reynolds violated the "cartoon" ban because it neglected to advise Rolling Stone about the ban, which resulted in Rolling Stone using cartoons in close proximity to Reynolds' advertisement.

¶ 35     Reynolds responds that it lacked awareness that Rolling Stone's editorial would include cartoons. Reynolds claims that Rolling Stone's editorial was separate from its advertisement and Rolling Stone independently produced the editorial. Reynolds contends that its inaction to prevent Rolling Stone from including cartoons in its editorial does not amount to Reynolds "using or causing to be used" a cartoon.

¶ 36     The MSA's ban on the use of "cartoons" prohibits Reynolds from "use or causing to be used cartoons in the advertising, promoting, packaging or labeling of tobacco products." If the MSA's drafters intended to include third parties in the restriction against using or causing to be used a "cartoon," then the drafters would have expressly included that intention in the provision's language. For example, incorporated elsewhere in the permanent relief section of the MSA is a provision entitled "Limitation on Third-Party Use of Brand Names," which states in part that "no Participating Manufacturer may license or otherwise expressly authorize any third party to use or advertise within any Settling State any Brand Name in a manner prohibited by this Agreement if done by such Participating Manufacturer itself." The ban against using "cartoons" includes no such language. Interpreting the contract as a whole, as we must, the prohibition on Reynolds against using or causing to be used a "cartoon" was not extended to incorporate a prohibition against a third party from using a "cartoon." The provision's express language does not impart on Reynolds an affirmative duty to ensure that an independent third party does not use or cause to be used a cartoon in advertising, promoting, packaging or labeling of its own products that are distinct from Reynolds' products. Here, Reynolds asserted that Rolling Stone's "Indie Rock Universe contained no content previewed, prepared by or paid for by R.J. Reynolds Tobacco Company (RJRT)."

Reynolds also asserted that "Other than being aware that the topic of Rolling Stone's gatefold editorial would be independent rock music, RJRT had no advance knowledge about the content or graphic format of Rolling Stone's gatefold." This assertion was stipulated to between the parties as reflected in stipulation number 10, which states that "Reynolds did not prepare or preview the five pages of illustrations entitled 'Indie Rock Universe' that appeared in the November 15, 2007, Fortieth Anniversary issue of Rolling Stone." Since the provision's express language does not place an affirmative duty on Reynolds to inform third parties of the ban against "cartoon" use and Reynolds had no involvement in Rolling Stone's editorial that included "cartoons," Reynolds did not violate the ban against "cartoon" use regarding the "cartoons" depicted in Rolling Stone's editorial.

¶ 37                                   CONCLUSION

¶ 38    The images Reynolds used in its "Camel Farm" campaign published in Rolling Stone consisted of a "cartoon" because the images depicted man-made objects with unnatural abilities, which included transformation. Since Reynolds used a "cartoon" in "the advertising, promoting, packaging, or labeling of Tobacco Products," it violated the "Ban on Use of Cartoons" provision in the MSA incorporated into the consent decree. The circuit court did not abuse its discretion in striking as relief sanctions because Reynolds suspended its "Camel Farm" advertising campaign. We remand this cause to the circuit court to determine the amount of attorney fees and costs that are appropriate as relief for Reynolds' violation of the consent decree. The images in the video and on the website, however, were not a "cartoon" because the images did not portray "comically exaggerated features." Reynolds also did not violate the consent decree by causing a "cartoon" to be used by Rolling Stone in its editorial because Reynolds had no affirmative duty to prevent Rolling Stone's use of a "cartoon."

¶ 39    Accordingly, the judgment of the circuit court is affirmed in part and reversed in part and the cause is remanded for further proceedings consistent herewith.

¶ 40    Affirmed in part and reversed in part; cause remanded.