# Illinois Official Reports

## Appellate Court

---

**Chicago Bears Football Club v. Cook County Department of Revenue,**
2014 IL App (1st) 122892

---

| | |
|---|---|
| Appellate Court Caption | CHICAGO BEARS FOOTBALL CLUB, Plaintiff-Appellee, v. THE COOK COUNTY DEPARTMENT OF REVENUE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-2892 |
| Filed | August 6, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the application of the Cook County Amusement Tax Ordinance imposing an "amusement tax" on the "admission fees or other charges" on seats for home football games of the Chicago Bears, the decision of an administrative law judge finding that the 3% tax applied to the amount paid for the seats, including the amenities available to holders of club seat tickets, such as the right to access the "club lounge" and special parking privileges, and that the luxury suites should be taxed based on 60% of the annual license fee due to the nonamusement charges and tangible personal property included in the luxury suite admission price, including food, beverages and parking, was affirmed by the appellate court. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-51142; the Hon. Margaret Brennan, Judge, presiding. |
| Judgment | Circuit court reversed; administrative order confirmed. |

Counsel on
Appeal

Anita M. Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Cristin Duffy, and Alvin Portis, Assistant State's Attorneys, of counsel), for appellant.

Schiff Hardin, LLP, of Chicago (James P. Gaughan and Larry Jacobson, of counsel), for appellee.

Panel

JUSTICE MASON delivered the judgment of the court, with opinion. Presiding Justice Hyman concurred in the judgment and opinion. Justice Pucinski dissented, with opinion.

## OPINION

¶ 1 Section 74-392(a) of the Cook County Amusement Tax Ordinance (the Ordinance) imposes an "amusement tax" of "three percent of the admission fees or other charges paid for the privilege to enter, to witness or to view such amusement." Cook County Ordinance No. 99-O-15, § 3 (approved Apr. 6, 1999). From February 2002 through April 2007, the Chicago Bears Football Club calculated and paid the amusement tax on the value of a seat for home football games, exclusive of other amenities available to the ticket holder and which are charged to the ticket holder as part of the ticket price. The Cook County department of revenue (the County) contends that the value of such amenities is subject to the amusement tax and issued an assessment charging the Bears with a tax deficiency. An administrative law judge (ALJ) agreed with the County and assessed delinquent amusement taxes and interest in the total amount of $4,135,184.68. On review in the circuit court, the administrative decision was reversed. We agree with the ALJ, reverse the circuit court and confirm the administrative decision.

¶ 2 BACKGROUND

¶ 3 The facts relevant to this dispute are largely stipulated.

¶ 4 All of the home games played by the Bears were played at the renovated Soldier Field during the tax periods at issue, with the exception of the 2002 season and two preseason games in 2003, which were played in Champaign, Illinois, while the stadium renovations were completed. Soldier Field has approximately 62,000 seats divided into three seating sections: regular seats, club level seats and luxury suites.

¶ 5 Regular seats are the majority of seats in Soldier Field. Regular seat tickets entitle each ticket holder to witness the football games. Regular ticket holders purchase food and beverages on concourses on the perimeter of the stadium or from vendors who periodically come to seating areas. Public restrooms are available for regular ticket holders. No other amenities are included in the ticket price.

¶ 6    The second seating section is located on the east side of Soldier Field and is comprised of approximately 8,600 seats called "club seats." Club I ticket holders sit on the 50-yard line and receive one parking pass for every two season tickets. Club II ticket holders sit between the 40- and 5-yard lines and receive one parking pass for every three season tickets. Club III ticket holders sit between the five-yard line and into the end zones and receive one parking pass for every four season tickets.

¶ 7    The holder of a club seat ticket is also entitled to a wide variety of privileges and amenities that are not included in the price of a regular ticket. These amenities include access to the "club lounge," a heated and air conditioned enclosed lounge adjoining the club seats for use before, during and after a football game. The club lounge can only be accessed by individuals who hold seating privileges in the club seat sections or the luxury suites. Club seats cannot be accessed except through the club lounge.

¶ 8    The club lounge opens two hours prior to kickoff and remains open for approximately two hours after the game. The lounge has a buffet area, bar areas, better and more varied food options not available in the regular seating areas and restrooms available only to club or luxury suite ticket holders. Food and beverages are not included in the price of a club ticket. There are 144 flat screen, high-definition televisions in the club lounge that on game days carry both Bears games and other NFL games. There are also two 20-foot jumbo screens at either end of the lounge that broadcast the Bears game in progress. The club lounge has private seating areas that can be used on days of Bears' home games and other nongame days. It is not possible to view the entire field of play from the club lounge.

¶ 9    Holders of club seat tickets are entitled to the following additional amenities and privileges: year-round membership in a club that provides the exclusive right to purchase tickets to non-Bears game events at Soldier Field prior to sales to the general public; the ability to purchase tickets for playoff games before the general public; special parking privileges; exclusive invitations to autograph sessions and merchandise giveaways; free game-day programs and media guides; and invitations to appreciation events year-round.

¶ 10    The last seating area is comprised of 133 luxury suites, referred to by the Bears as "Executive Suites," and a "Skyline Suite." (The parties refer to both types of suites as "luxury suites.") Executive Suites are located above the club seating section on the east side of Soldier Field. The suites are licensed for a period of years in a contract between the Bears and licensees who pay license fees annually. For the 2007 season, Executive Suite annual fees ranged from $72,720 to $300,000. Each suite contains a private enclosed area where the licensee of the suite is entitled to bring up to 20 guests. The suites have seating areas away from the field of play and a variety of amenities, including individual controls for heat and air conditioning, private bathrooms, high-definition televisions and space to consume food and drink. Windows in the Executive Suites open if desired. The sight lines of Executive Suites are comparable to the sight lines of certain of the regular seats on the 400 level of the west side of the stadium, which span the entire playing field. Seating in Executive Suites is tiered so that all guests can view the field while seated.

¶ 11    There is also a Skyline Suite. The Skyline Suite is shared among 183 licensees. The Skyline Suite license agreement provides that the licensee is granted: "(a) the non-exclusive license and privilege to use the Skyline Suite located in the Executive Suite Area of Soldier Field ('Stadium') *** and (b) the exclusive license and privilege to use the Suite Spectator Seats in the Skyline Suite designated above (the 'Spectator Seats')." Spectator Seats are

located outside immediately below the Skyline Suite and can only be accessed by Skyline Suite licensees and their guests. Food and beverages are included as part of the Skyline Suite annual fee.

¶ 12    The luxury suite licenses include many other amenities and privileges not available to either regular or club seat ticket holders, including first option to use the luxury suite for most non-Bears events held at Soldier Field, travel arranged by the Bears for certain games outside Chicago, invitations to non-football-game events exclusively for licensees during the year, participation in game-day drawings for special prizes (such as autographed memorabilia), a certain number of free parking spaces, special recognition in Bears publications, better and wider selection of food for purchase and invitations to other appreciation events year-round. With the exception of the Skyline Suite, luxury suite licenses do not generally include food or beverages as part of the license fee.

¶ 13    Regular and club tickets have assigned seat numbers. Tickets for luxury suites state only the level area, the suite number and the ticket number, but do not have an assigned seat. On the face of club seat tickets, the Bears bifurcate the price between an amount for the "ticket price" and what is labeled the "club privilege fee." The Bears assign the same ticket price to every club seat ticket regardless of whether the seat is on the 50-yard line or in the end zone; only the club privilege fee changes according to the location of the ticket–the better the location, the higher the club privilege fee. The Bears pay the amusement tax on the stated admission price, but not on the club privilege fee. Neither the luxury suite licenses nor the face of the admission tickets to luxury suites lists a value for either the seat or the privileges included with the ticket. Rather, the Bears internally assign a value to the seat portion of the ticket equal to the highest price for a regular seat (*e.g.*, $104 in 2007) and calculate the amusement tax on only that portion of the ticket.

¶ 14    Separate ticket prices for both the club seat and the luxury suites are listed in NFL box offices statements prepared pursuant to a revenue sharing agreement among NFL teams, which provides for league members to share a percentage of the admission fees for football games. In accordance with NFL rules, the ticket admission prices for luxury suites are set at the highest ticket price for the stadium. As reflected in box office statements prepared by the Bears for 2003 through 2007, club seats were valued at their face amounts, which, by way of example, were $235, $295 and $340 in 2007, while luxury suite seats were valued at $104. Karen Murphy, the Bears' treasurer, testified at the administrative hearing that despite the listing of the face amount of club seat tickets in the box office statements, the Bears actually used the "ticket price" (*e.g*., $77.27) printed on the face of the ticket for purposes of revenue sharing.

¶ 15    The Bears produced two luxury suite contracts out of 133 contracts that also offer food and beverages as part of the license fee. The County's decision to impose the amusement tax on 60% of the annual license fee for luxury suites was based on the assumption that all luxury suite licenses included food and beverages, which are not subject to the amusement tax because they are tangible goods and are separately taxed. Although based on the evidence presented at the administrative hearing the County's assumption proved incorrect, the County does not seek to impose the amusement tax on a higher percentage of the luxury suite license fee. The Bears did not produce any contracts or other documents to establish any non-amusement portion of the club seats. Rather, they relied on the NFL box office statements as a basis to exclude any amounts above the ticket price amounts used in those statements.

¶ 16    Section 74-392(a) of the Ordinance imposes an "amusement tax" of "three percent of the admission fees or other charges paid for the privilege to enter, to witness or to view such amusement." Cook County Ordinance No. 99-O-15, § 3 (approved Apr. 6, 1999).

¶ 17    Section 74-391 of the Ordinance defines "amusement" as:

"[A]ny exhibition, performance, presentation or show for entertainment purposes, including, but not limited to, any *** sport, game or similar exhibition, such as *** football ***." Cook County Ordinance No. 99-O-15, § 2 (approved Apr. 6, 1999).

¶ 18    Finally, section 74-392(e) provides:

"For the purpose of determining the amount of the amusement tax due under this article, admission fees or other charges shall be computed exclusive of any Federal, State or municipal taxes imposed upon the amusement patron and *any separately stated charges for nonamusement services* or for sales of tangible personal property." (Emphasis added.) Cook County Ordinance No. 99-O-15, § 2 (approved Apr. 6, 1999).

¶ 19    The ALJ concluded that club seats should be taxed based on 100% of the club seat ticket price and luxury suites should be taxed based on 60% of the annual license fee because there were non-amusement charges and tangible personal property included in the luxury suite admission price, including food, beverages and parking. In the course of his ruling, the ALJ concluded that the term "amusement" as used in the Ordinance was ambiguous and found, based on the Bears' promotional materials, that the amenities associated with club seats and luxury suites were part of the "game day experience" and thus should be included for purposes of calculating the amusement tax. The ALJ found that the Bears did not act negligently or willfully in failing to pay the amusement tax and denied the County's request for the imposition of penalties.

¶ 20    The circuit court reviewed the administrative decision and reversed the ALJ's determination. The County timely appealed.

¶ 21                          ANALYSIS

¶ 22    In administrative review cases, we review the decision of the administrative agency, not the determination of the circuit court. *Cerone v. State*, 2012 IL App (1st) 110214, ¶ 11 (citing *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 272 (2009)). The parties dispute the applicable standard of review, with the County maintaining that this case presents a mixed question of fact and law to which the clearly erroneous standard of review applies, while the Bears assert that the only issue is the legal question of interpretation of the amusement tax Ordinance, which we review *de novo*.

¶ 23    Mixed questions of fact and law " 'are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." ' " *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008) (quoting *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005), quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)). Mixed questions of law and fact are subject to the "clearly erroneous" standard of review where the agency's determination is deemed "clearly erroneous" only if we are left with the " ' "definite and firm conviction that a mistake has been committed." ' " *Cinkus*, 228 Ill. 2d at

211 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 24 An agency's conclusions of law, on the other hand, are not entitled to deference, and we review them *de novo*. *Illinois Fraternal Order of Police Labor Council v. Illinois Local Labor Relations Board*, 319 Ill. App. 3d 729, 736 (2001). " '[W]here the historical facts are admitted or established, but there is a *dispute* as to whether the governing legal provisions were interpreted correctly by the administrative body, the case presents a purely legal question for which our review is *de novo*.' " (Emphasis in original.) *AT&T Teleholdings, Inc. v. Department of Revenue*, 2012 IL App (1st) 113053, ¶ 29 (quoting *Goodman v. Ward*, 241 Ill. 2d 398, 406 (2011)). If the appeal involves interpretation of a statute the agency is charged with administering, courts accord some deference to the agency's interpretation, but the agency's interpretation is not binding. *Swank v. Department of Revenue*, 336 Ill. App. 3d 851, 855 (2003); *AFM Messenger*, 198 Ill. 2d at 394.

¶ 25 This case hinges entirely on the legal question regarding interpretation of the Ordinance and we agree with the Bears that the *de novo* standard of review applies. Moreover, although we accord some deference to the ALJ's interpretation of the Ordinance, the meaning of the Ordinance does not entail any particular level of expertise in revenue matters and, thus, as in any case, the ALJ's interpretation is not binding on this court.

¶ 26 As the Ordinance imposes a tax, special rules of construction apply. " 'Tax laws must be strictly construed; they must be given a reasonable construction, without bias or prejudice against either the [taxing body] or the taxpayer, in order to effectuate the intent of the legislature.' " *Panhandle Eastern Pipeline Co. v. Hamer*, 2012 IL App (1st) 113559, ¶ 25 (quoting *Northwest Airlines, Inc. v. Department of Revenue*, 295 Ill. App. 3d 889, 892 (1998), citing *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 202 (1989)). "[T]he language of the tax statute shall not be 'extended or enlarged beyond its clear import' and 'where the legislature has seen fit to define a particular statutory term, we are bound by the definition as long as it is reasonable.' " *Hamer*, 2012 IL App (1st) 113559, ¶ 25 (quoting *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 275 (1998)). Moreover, it is well established that " '[a] tax statute must be strictly construed against the government and in favor of the taxpayer.' " *Hamer*, 2012 IL App (1st) 113559, ¶ 25 (quoting *Kankakee County Board of Review v. Property Tax Appeal Board*, 226 Ill.2d 36, 52 (2007)). " ' "In cases of doubt they are construed most strongly against the government and in favor of the taxpayer." ' " *USX Corp. v. White*, 352 Ill. App. 3d 709, 720 (2004) (quoting *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 202 (1989)).

¶ 27 But where the taxing authority has made out a *prima facie* case that goods or services are subject to taxation, the burden shifts to the taxpayer to demonstrate by competent evidence that the subject of the tax assessment is exempt. *United Air Lines, Inc. v. Johnson*, 84 Ill. 2d 446, 455 (1981) ("A person claiming an exemption from taxation has the burden of proving clearly that he comes within the statutory exemption. Such exemptions are to be strictly construed, and doubts concerning the applicability of the exemptions will be resolved in favor of taxation."); *Soho Club, Inc. v. Department of Revenue*, 269 Ill. App. 3d 220, 231 (1995). "A taxpayer cannot overcome the Department's *prima facie* case merely by denying the accuracy of the assessments, but must present evidence which is consistent, probable, and identified with its

books and records." *Estate of Graham v. Department of Revenue*, 162 Ill. App. 3d 754, 759 (1987).

¶ 28    At the outset, we disagree with the ALJ's conclusion that the word "amusement" in the Ordinance is ambiguous or that we need to resort to the concept of the "game day experience" touted by the Bears in their promotional materials in order to find the price paid by club seat ticket holders and luxury suite licensees taxable. The parties agree that a football game is an "amusement" and the only question is whether the prices paid for club seats and luxury suites constitute "admission fees or other charges paid for the privilege to enter witness or view such amusement."

¶ 29    The Bears will not afford any fan the "privilege to enter, witness or view" a Bears home game from a club seat unless that fan simultaneously pays the club privilege fee. By the same token, the Bears will not extend the "privilege to enter, witness or view" a game in a luxury suite to anyone who has not entered into a licensing agreement and paid the annual license fee. Quite simply, fans who want to witness a Bears home game from a club seat or a luxury suite cannot get to a seat where they can watch the game without paying the price attendant to those seats. Thus, it is impossible to separate these "other charges" from the fee paid to enter the stadium.

¶ 30    This court recently addressed a similar issue relating to an amusement tax imposed under the City of Chicago's municipal code. In *Stasko v. City of Chicago*, 2013 IL App (1st) 120265, *appeal denied*, No. 116848 (Ill. Jan. 29, 2014), plaintiffs, third-party sellers, challenged the city's imposition of an amusement tax on amounts received for permanent seat licenses (PSL) issued by the Bears.[1] A PSL entitled the license holder to purchase a season ticket for a specific seat for Bears home games, but the PSL itself did not permit the licensee to enter Soldier Field to witness any game. The relevant provision of the Chicago Municipal Code was substantially similar to the County's Ordinance and imposed a tax on "the admission fees or other charges paid for the privilege to enter, to witness, to view or to participate in such amusement." Chicago Municipal Code § 4-156-020(A) (amended Nov. 19, 2008).

¶ 31    The *Stasko* plaintiffs contended that the PSL did not give them the right to enter, witness or view a game and argued that the city's amusement tax could apply only to the charge for actual entry to the amusement, *i.e.*, to the price of a "ticket." *Stasko*, 2013 IL App (1st) 120265, ¶ 57. Rejecting plaintiffs' position, this court stated:

> "According to plaintiffs, it is the price of the ticket, and only the price of the ticket, which constitutes the 'admission fees or other charges paid for the privilege to enter, to witness, to view or to participate in [the] amusement.' This argument is irreconcilable with the plain language of the ordinance. Plaintiff's interpretation of the ordinance would render the language 'other charges' completely superfluous to 'admission fees.' " *Id.* ¶ 58.

Accordingly, the court found that the price paid for a PSL represented a charge for the privilege of viewing the amusement. *Id.* ¶ 59. Succinctly, the court in *Stasko* stated, "[p]urchasing the PSL is a prerequisite to viewing the game from a seat covered by a PSL." *Id.* ¶ 62.

---

[1]Although not at issue in the case, the opinion notes that the Bears paid the city amusement tax on initial sales of PSLs, conduct inconsistent with the Bears' position in this case that it is only the stated ticket price that is subject to the County's amusement tax.

¶ 32    The reasoning of *Stasko*, applied here, compels the conclusion that the full price paid by club seat ticket holders and luxury suite licensees is subject to the County's amusement tax. Purchasing a club seat ticket (which cannot be purchased without also paying the club privilege fee) or a luxury suite ticket (which cannot be obtained without entering into a license agreement and paying the annual license fee) is a prerequisite to the privilege of viewing a Bears game from either a club seat or a luxury suite. Thus, the charges paid by fans who purchase these premium seats are part of the "admission fees or other charges" paid for the privilege of viewing a Bears game.

¶ 33    The Bears argue that *Stasko* should not control the outcome of this case given that the city ordinance contains the following definition of "special seating areas":

> "an enclosed or substantially enclosed apartment-style room containing or making available amenities for the exclusive use of the patrons thereof, whether denominated as luxury or super suites or skyboxes or by other similar terms. Such amenities may include, but are not necessarily limited to, television (including closed-circuit capacity), bathroom, refrigerator, telephone service, storage sink, living room or lounge furniture, special spectator seating, food, heat, air conditioning and parking." Chicago Municipal Code § 4-156-010 (amended Nov. 19, 2008).

The Bears reason that because the County Ordinance contains no such definition, an interpretation of the Ordinance that encompasses the fees paid for club seats and luxury suites is unwarranted. We disagree. A definition of "special seating areas" is unnecessary to support the conclusion we have reached above that amounts paid for club seats and luxury suites are part of the "admission fees and other charges" paid for the privilege of witnessing a Bears game. Thus, the fact that the city has chosen to include a definition of "special seating areas" in the Chicago Municipal Code is irrelevant.

¶ 34    The amenities associated with club seats and luxury suites–for which the ticket holders are willing to pay and which are not sold separately from the seats to which the amenities apply–are part and parcel of the "admission fees or other charges" paid by these ticket holders for the privilege of entering, witnessing or viewing a Bears home game. Given this conclusion, the County met its burden of establishing a *prima facie* case that the tax applied to these charges and, in fact, the Bears agreed at the administrative hearing that the County had made such a showing. Consequently, because the Bears took the position that something less than the "admission fees or other charges" paid by certain ticket holders was subject to the County tax, it was incumbent on the Bears to adduce evidence to support the exemption. *United Air Lines*, 84 Ill. 2d at 455; *Soho Club, Inc.*, 269 Ill. App. 3d at 231.

¶ 35    On this point, the Bears attempt to characterize the amenities associated with club seats and luxury suites as "non-amusement services." This contention cannot withstand analysis. The Ordinance requires that fees for nonamusement services be "separately stated." Therefore, since the luxury suite license agreements in the record aggregate the license holder's payment into a single, nondifferentiated annual fee, and the Bears adduced no evidence, other than the box office statements, that they internally assigned any portion of the license fee to nonamusement services, there is no basis in the record to exclude any portion of those fees from the tax. As to the club seat tickets, the Bears list on the face of the ticket a ticket price and the club privilege fee, so we must consider whether the club privilege fee can be characterized as a fee for "non-amusement services."

- 8 -

¶ 36     The exemption in the Ordinance by its terms is limited to (i) services of a nonamusement character and (ii) tangible personal property available for sale. An example of the former would be the availability of Wi-Fi or parking (for which the Bears failed to prove a value at the hearing before the ALJ). Tangible personal property would include food or a game-day program (again, the Bears failed to value the program book at the hearing). But "non-amusement services" cannot be fairly characterized to include such items as (i) special recognition in Bear publications, (ii) better and wider food selection, (iii) climate controlled surroundings, (iv) participation in a game-day drawing, (v) exclusive invitations to autograph sessions and merchandise giveaways, (vi) invitations to appreciation events, or (vii) the ability to purchase tickets for playoff games, all of which are inseparable from the amusement itself and unavailable for purchase independently of the ticket. To suggest that all of these aspects of premium seats are "non-amusement services" does not conform to the reality that these amenities are the precise reason why Bears fans are willing to pay enhanced prices to obtain these tickets.

¶ 37     Thus, while the Bears may have "separately stated" the club privilege fee on the face of a club seat ticket, that fee is nevertheless part of the "admission fee or other charges" paid by fans to witness a game from a club seat. At best, the Bears could have argued that the value of parking privileges associated with premium seats should have been excluded from the tax. But not only is the value of the parking pass not "separately stated" either on the face of the ticket or in records maintained by the Bears, but the Bears also failed to present any evidence that they internally assigned a value to parking passes provided to club seat ticket holders and luxury suite licensees during the tax periods in question. Rather, the only evidence in the record is a spreadsheet prepared for the administrative hearing in which the Bears purported to list the value of parking passes provided to club seat ticket holders. Under these circumstances, the ALJ appropriately declined to deduct the value of parking passes from club seat tickets.

¶ 38     The Bears point to the NFL box office statements and contend that the league rules that allow member teams, for purposes of revenue sharing, to value seats at the highest price charged for regular stadium seats, should determine the amount of the ticket price subject to the County tax. But what rules NFL teams have agreed to *inter se* cannot control and are irrelevant to our interpretation of the County's Ordinance. See *LZM, Inc. v. Virginia Department of Taxation*, 606 S.E.2d 797, 801 (Va. 2005) (taxpayer subject to tax on sale or lease of tangible property could not claim reduced tax liability by separately stating a charge for a "service" associated with that property on its invoices, where the "service" was inseparable from the property and could not be purchased without purchasing the property; "[o]therwise, a taxpayer could create its own tax exemption merely by altering the printing of its invoices").

¶ 39     An examination of the application of the league rules relied upon by the Bears to a typical luxury suite illustrates the point. The average license fee for a luxury suite is $150,000. With eight home games and two preseason games covered in the annual fee, the license holder pays $15,000 per game. Dividing that figure by the 20 seats allocated to the suite yields a per ticket price of $750. But by the Bears' accounting according to league rules, the tickets are valued at $104 (or $2,080 for 20 tickets) and the "non-amusement" charges allocable to each ticket are $646 (or $12,920 for the suite). The absurdity of excluding the vast majority of ticket revenues from the amusement tax when the generation of those revenues is driven by fans' desire for the "privileges" associated with premium seats renders the Bears' position untenable.

¶ 40    Finally, the Bears contend that the County's decision to impose the amusement tax on 60% of the annual license fee paid by luxury suite licensees is arbitrary. As noted, the County discounted the amount of the fee on which the tax would be imposed based on the assumption that food and beverages were included in all luxury suite licenses. This assumption proved incorrect. In fact, the evidence shows that food and beverages are only included in the Skyline Suite contracts. Thus, the Bears are correct that application of the 40% discount to luxury suite license fees other than the Skyline Suite is arbitrary. The correction of the error, however, would not work in the Bears' favor; it would instead result in the imposition of the amusement tax on the entire license fee in light of the Bears' failure to adduce any evidence of "separately stated charges for non-amusement services or for sales of tangible personal property" included in the license fee. Consequently, because the County does not contest in this appeal the ALJ's decision to assess the tax on 60% of the luxury suite revenues, the "arbitrary" reduction of the amount of the license fee subject to the amusement tax provides no basis for reversal of the ALJ's decision.

¶ 41    Fundamentally, adoption of the Bears' position in this case would allow any purveyor of an amusement in Cook County to unilaterally and arbitrarily allocate a fraction of the face value of any ticket to the "privilege to enter" the venue in order to "view" the amusement for purposes of calculating amusement taxes due, regardless of whether the admission price also included charges for the privilege of viewing the amusement from front row center seats, securing backstage passes or accessing a VIP lounge. But because the Ordinance on its face imposes the tax on "admission fees and other charges" paid for the privilege to enter the venue and view the amusement, the amenities associated with higher priced tickets cannot be separated from the price to enter the venue and view the event and they are, therefore, subject to the County amusement tax.

¶ 42    For the reasons stated, the order of the circuit court is reversed and the order of the ALJ assessing past due amusement taxes plus interest is confirmed.

¶ 43    Circuit court reversed; administrative order confirmed.

¶ 44    JUSTICE PUCINSKI, dissenting.

¶ 45    With respect, I dissent.

¶ 46    I disagree that the ALJ's determination can be upheld for the amount it determined was taxable for either the club seat tickets or the luxury suite licenses.

¶ 47    First, the ALJ's determination that the club seats should be taxed based on 100% of the club seat ticket price cannot be supported. Section 74-392(e) provides:

> "For the purpose of determining the amount of the amusement tax due under this article, admission fees or other charges shall be computed exclusive of any Federal, State or municipal taxes imposed upon the amusement patron and any *separately stated charges for nonamusement services or for sales of tangible personal property.*" (Emphasis added.) Cook County Ordinance No. 99-O-15, § 2 (approved Apr. 6, 1999).

¶ 48    The Bears' ticket price for the club seat tickets clearly meets the exception in section 74-392(e) for "any separately stated charges for nonamusement services." Cook County Ordinance No. 99-O-15, § 2 (approved Apr. 6, 1999). The Bears bifurcate the club seat ticket prices between ticket admission price and the "Club Privilege Fee" on the face of the ticket.

Karen Murphy, treasurer of the Bears, testified that the club seat tickets separately stated the ticket price, which represents the charge to enter the stadium to view the football game, and the "Club Privilege Fee," which represents the charge for the extra amenities offered to club members. Murphy explained that the ticket price is the charge for the fan to enter the stadium and that amount was set as the most expensive ticket in the stadium. The club privilege fee includes many amenities, including access to the "club lounge," a heated and air conditioned lounge adjoining the club seats for comfort before, during and after a football game, where there is a buffet area, bar areas, and other food options not available to people in the regular seating areas. The club lounge also has private seating areas that can be used on days of Bears' home games and other nongame days. The club lounge can only be accessed by individuals who hold privileges for the club sections and the luxury suites. Holders of club seat privileges are also entitled to the following amenities and privileges: year-round membership in a club that provides the exclusive right to purchase tickets to non-Bears game events at Soldier Field prior to the time tickets go on sale to the general public; the ability to purchase tickets for playoff games before the general public; special parking privileges; exclusive invitations to autograph sessions and merchandise giveaways; free game day programs and media guides; invitations to appreciation events year-round; and better and wider selection of food than in the regular area. The value of all these club privileges was aggregated; there was no separate charge for each amenity, such as parking, game day programs and the like. Murphy testified that the club seat ticket shows the following on its face: $77.27 for the ticket price; $7.73 for taxes on the ticket price; and $110 for the club privilege fee.

¶ 49 I find the County's rationale for taxing the entire amount of the club seats is wholly unsupported. Aamed Pryor, who conducted the audit of the Bears for the amusement tax, and testified as the only witness for the County, conceded that the club amenity fee was specifically and separately set forth on the face of the ticket. Pryor nevertheless decided that the club amenities were part of the "total admission price." Pryor indicated to the Bears that the club privilege fees would be taxed as well as the ticket prices, and also the luxury suites, because the Bears "didn't have an agreement with the Cook County Department of Revenue." According to Pryor's rationale, the Bears did not have any agreement with the County whereby the Bears could segregate fees for the amenities for the club tickets and luxury suites. But there is no requirement anywhere in the ordinance for any kind of permission from, or agreement with, the County, regarding setting the admission ticket prices that are separately stated on the face of the tickets.

¶ 50 The majority acknowledges the exception in 74-392(e) for "any separately stated charges for nonamusement services" (Cook County Ordinance No. 99-O-15, § 3 (approved Apr. 6, 1999)), and acknowledges that the Bears' club seat tickets indeed "separately state" these nonamusements charges for the club privilege fee, but chooses to ignore this because "that fee is nevertheless part of the 'admission fee or other charges' paid by fans to witness a game from a club seat." This view runs counter to well-established canons of statutory interpretation. "Each word, clause and sentence of a statute should be given reasonable meaning and not rendered superfluous." *People ex rel. Department of Labor v. Sackville Construction, Inc.*, 402 Ill. App. 3d 195, 198 (2010). A fundamental rule of statutory construction is that when a general provision and a specific provision of a statute relate to the same subject, it is the specific provision that controls and should be applied. *People v. Villarreal*, 152 Ill. 2d 368, 379 (1992). See also *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d

652, 661 (2005) ("If a general statutory provision and a specific statutory provision relate to the same subject, the specific provision prevails."); *People v. Arnhold*, 359 Ill. App. 3d 857, 861 (2005) ("the specific controls the general"). The specific provision in section 74-392(e) providing that "separately stated" nonamusement charges are nontaxable clearly applies. Taxing the Bears for the club privilege fee which is separately stated on the face of the club seat tickets violates the ordinance.

¶ 51   Second, the ALJ's determination that the luxury suite license fees should be taxed at 60% of the full luxury suite fee also cannot be supported. I note that the majority affirms the administrative order and holds that application of the tax to 60% of the luxury suite license fees other than the Skyline Suite is indeed arbitrary but holds that this arbitrary reduction is not a basis for reversal of the ALJ's decision, and further holds that the entire amount of the luxury suite license fees is subject to the County amusement tax. I agree that, because the amount of the nonamusement charges is not separately stated, the entire amount of the luxury suite license fee is subject to the amusement tax. But this necessarily means that the ALJ's 60% tax determination on luxury suites must be reversed. I therefore cannot concur in the result.

¶ 52   The Bears do not list a specific separate price for the luxury suite spectator seat cost within the luxury suite contracts or on the face of the admission ticket. Pryor determined to apply the tax to 60% of the luxury suite amenity fees, with no explanation how he arrived at this conclusion or the 60% figure. The ALJ concluded that the luxury suites should be taxed based on only 60% of the full admission price, including food, beverages and parking, but also did not explain how this calculation resulted in a 60% figure.

¶ 53   The ALJ's determination that the luxury suites should be taxed based on 60% of the full admission price finds no support anywhere, either in the ordinance or in the evidence.

¶ 54   There is no support anywhere in the County ordinance for taxing at a rate of 60% of the full luxury suite charges. We find such a taxation rate in Chicago's amusement tax ordinance, as pointed out by the Bears. Section 4-156-020 of the Chicago Municipal Code provides that Chicago's amusement tax applies to "60 percent of the admission fees or other charges *** paid for the privilege of using special seating areas to witness or to view an amusement." See Chicago Municipal Code § 4-156-020(F) (added Dec. 9, 1992).

¶ 55   Unlike the majority, I find the difference between the city amusement tax ordinance and the County's amusement tax ordinance crucial. *Stasko* is indeed distinguishable not because the city ordinance merely contains a definition of a "special seating area," but because the city ordinance expressly provides for taxation of those special seating areas. The County ordinance does not.

¶ 56   I am unwilling to effectively rewrite the ordinance to say what the County wants it to say. "We must interpret and apply statutes in the manner in which they are written and cannot rewrite them to make them consistent with our own idea of orderliness and public policy." *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 406 (2010) (citing *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 558 (2009)). "A court may not add provisions that are not found in a statute, nor may it depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express." *Schultz*, 237 Ill. 2d at 408 (citing *Madison Two Associates v. Pappas*, 227 Ill. 2d 474, 495 (2008)). The County has the example of the city ordinance if it wishes to tax the Bears for the special seating areas in Soldier Field, and it can amend the ordinance. The fact that the County is not challenging the ALJ's 60% tax determination for the entire price of the luxury suites

does not change the fact that there is no support under the ordinance for this calculation, nor the fact that the ALJ's determination of this figure was completely arbitrary and clearly erroneous.

¶ 57    I further note that there are no additional County regulations pertaining to the amusement tax provisions in the County ordinance that would assist either the County or the taxpayers. The County amusement tax ordinance provides no guidance to the taxpayer, leaving the taxpayers to figure out the ordinance. Then when the County disagrees with the taxpayer's application of the ordinance the County penalizes the taxpayer. This sort of "gotcha" taxation should not be tolerated.

¶ 58    On the other hand, as to the luxury suites, the Bears clearly did not prove their entitlement to the exception for nonamusement charges for the full amount of the difference between all the claimed amenities and their designated ticket price, as the different charges for nonamusement amenities are not separately stated on the face of the luxury suite admission tickets. The Bears provided evidence that some of the difference in cost between the base ticket price and the full price for a luxury suite license was attributable only to amenities that were not part of the privilege to "enter, witness or view" an amusement, but failed to prove that the full amount of the difference was exempt under the exception in section 74-392(e). Indeed, the Bears did not provide sufficient evidence to prove any particular amount as the difference in cost attributable only to amenities that were not part of the privilege to "enter, witness or view" an amusement. The Bears' evidence, including the DVD tour of the stadium, was woefully insufficient to claim any particular amount of this difference as an exemption from the amusement tax. The Bears simply do not meet the ordinance's "separately stated charges" requirement for nonamusement charges versus the admission price of seat tickets for the luxury suites. The entire amount of the luxury suite license fees is therefore subject to the amusement tax, and the ALJ's arbitrary 60% determination must be reversed.

¶ 59    I would reverse, remand and instruct the court to enter a judgment taxing only the ticket price separately stated on the face of the club seat tickets, and taxing the entire amount of the luxury suite license fees.